IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, PRAIRIE RIVERS NETWORK, MISSOURI COALITION FOR THE ENVIRONMENT, RIVER ALLIANCE OF WISCONSIN, GREAT RIVERS HABITAT ALLIANCE, and MINNESOTA CONSERVATION FEDERATION,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL THOMAS P. BOSTICK, Commanding General and Chief of Engineers,  LT. GENERAL DUKE DELUCA, Commander of the Mississippi Valley Division of the Army Corps of Engineers,<br><br>Defendants. | CASE NO. 14-590-JPG-DGW<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.      INTRODUCTION

1.      Plaintiffs NATIONAL WILDLIFE FEDERATION, PRAIRIE RIVERS NETWORK, MISSOURI COALITION FOR THE ENVIRONMENT, RIVER ALLIANCE OF WISCONSIN, GREAT RIVERS HABITAT ALLIANCE, and MINNESOTA CONSERVATION FEDERATION seek to protect the Upper Mississippi River System, which comprises over 1,200 miles of river and 2.6 million acres of aquatic and terrestrial habitat, including ten National Wildlife Refuges.  Defendant UNITED STATES ARMY CORPS OF ENGINEERS (Corps) carries out a number of  activities (collectively, the "Project") in order to maintain a navigation channel at least nine feet deep in the Upper Mississippi River (northern Minnesota to the Ohio River confluence), as well as portions of the Illinois, Kaskaskia, Minnesota, St. Croix, and Black Rivers.  The Project involves both operations and maintenance ("O&M") and regulating works activities, all aimed at maintaining a nine-foot deep navigation channel.  Operations and maintenance activities include operating locks and dams and dredging to control the route, depth, and flow rate of the rivers.  Regulating works activities include construction and maintenance of river training structures and placement of revetment.  Both O&M and regulating works activities are carried out by the Corps' St. Louis, Rock Island, and St. Paul Districts, pursuant to the Corps'

authority under the Rivers and Harbors Acts and the Water Resources Development Acts ("WRDAs").  The Project is ongoing and is expected to continue through 2050 and likely beyond.  The Project has thoroughly transformed the Upper Mississippi River System ("UMRS") to the detriment of local wildlife.  In large part due to the Corps' activities, the Upper Mississippi River System is in an extremely ecologically degraded state, and the surrounding communities are at increased risk of personal injury and property damage from floods.  The risks to public safety will only increase as the Corps constructs more river structures.

2.     Despite the Project's growing environmental damage, the Corps continues to rely on four Environmental Impact Statements ("EISs") issued in the mid-1970s and one issued in 1997 to satisfy its obligations under the National Environmental Policy Act of 1969 (NEPA).  These EISs are inadequate because each evaluated only a small section of the Project.  The Corps has never issued an EIS addressing the cumulative impacts of its hundreds of construction projects and ongoing O&M activities in the Upper Mississippi River System.  The inadequacy of the existing EISs and the need to prepare a new, comprehensive EIS is compounded by the fact that the circumstances surrounding the Project, knowledge about the environmental harm it causes, and indeed the Project itself have all significantly changed since the 1970s.  NEPA requires a Supplemental EIS ("SEIS") in these circumstances.  Yet the Corps has decided to prepare – and is in the process of preparing – an SEIS only for its "regulating works" activities, including bank stabilization, construction of river training structures, and other projects "to ensure adequate navigation and depth," and not its O&M activities.  U.S. Army Corps of Engineers, Regulating Works: Supplemental Environmental Impact Statement website, www.mvs.usace.army.mil/Missions/Navigation/SEIS.aspx.

3.     On April 21, 2014, the Corps released Environmental Assessments ("EAs") and Findings of No Significant Impact ("FONSIs") for three extensive new regulating works projects (collectively, "New Projects") comprising multiple rootless dikes, miles of bankline revetments, and twelve bendway weirs.  Monsenthein/Ivory Landing Final EA and FONSI at 5; Eliza Point/Greenfield Bend Final EA and FONSI at 5; Dogtooth Bend Final EA and FONSI at 5.  All

three EAs tier off a now obsolete 1976 EIS.  *See* Monsenthein/Ivory Landing Final EA and FONSI at 2-3[1]; Eliza Point/Greenfield Bend Final EA and FONSI at 2-3[2]; Dogtooth Bend Final EA and FONSI at 2-3.[3]  The EAs claim that they have "incorporated new information and circumstances relevant to the impacts of the action on the environment to the greatest extent possible."  Monsenthein/Ivory Landing Final EA and FONSI at 3; Eliza Point/Greenfield Bend Final EA and FONSI at 3; Dogtooth Bend Final EA and FONSI at 3.  But that is not enough.  NEPA requires that the EAs tier off a valid, complete SEIS or that the Corps prepare a full EIS for each of the new proposed projects.

4.      Plaintiffs seek (1) a judgment declaring that defendants' decision to proceed with new river training structure projects prior to completing an SEIS is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) an injunction ordering the defendants to prepare an SEIS that analyzes the Project as a whole, including both regulating works and O&M activities, their cumulative effects on the Upper Mississippi River System and associated floodplains, and all reasonable alternatives to the Project; and (3) an order halting construction on the New Projects and halting approval and/or construction of any additional river training structures until the required environmental reviews have been completed.

## 1.      JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action under 28 U.S.C. §§1331 (federal question), 1337 (regulation of commerce), 1346 (United States as defendant), 1361 (mandamus against an officer of the United States), 2201 (declaratory judgment), and 2202 (injunctive relief),

---

[1] *Available at*
http://www.mvs.usace.army.mil/Portals/54/docs/pm/Reports/EA/Mosenthein%20Ivory%20Landing%20Phase%204%20Final%20EA%20FONSI%20and%20Appendices.pdf.
[2] *Available at*
http://www.mvs.usace.army.mil/Portals/54/docs/pm/Reports/EA/Eliza%20Point%20Greenfield%20Bend%20Phase%203%20Final%20EA%20FONSI%20and%20Appendices.pdf.
[3] *Available at*
http://www.mvs.usace.army.mil/Portals/54/docs/pm/Reports/EA/Dogtooth%20Bend%20Phase%205%20Final%20EA%20FONSI%20and%20Appendices.pdf.

and under the Administrative Procedure Act ("APA"), 5 U.S.C. sections 701-706 (compel agency action unlawfully withheld) because (1) the action arises under NEPA and the regulations implementing NEPA; (2) the Corps is an agency of the United States government and the individual defendants are sued in their official capacities as officers of the United States; (3) the action seeks a declaratory judgment; and (4) the lawsuit also seeks injunctive and mandamus relief.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(A) and (e)(1)(C) because defendant Corps resides in this district and because plaintiff Prairie Rivers Network resides in this District within the meaning of 28 U.S.C. § 1391(c)(2).  In addition, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(B) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

7.      Plaintiffs are not required to provide defendants any written notice of intent to sue on claims arising under NEPA and the APA.  Nonetheless, in an effort to avoid litigation, plaintiff National Wildlife Federation has reached out to the Corps on numerous occasions to discuss the problems with the Corps' O&M activities, and has requested that the Corps prepare an SEIS covering both regulating works and O&M activities and that it stop constructing new channel training structures until that analysis was completed.  See e.g., Feb. 16, 2012 Letter to Jo-Ellen Darcy from the National Wildlife Federation.  Ms. Darcy denied these requests by letter dated March 22, 2012.  While the Corps is currently preparing an SEIS on its regulating works activities, it continues to approve and construct new projects during this time.  Moreover, the SEIS covers only regulating works activities, such as construction of river training structures, and not operations and maintenance activities, such as the operation of locks and dams.  O&M activities have fundamentally transformed the flow and ecosystem of the Upper Mississippi River System. Without analyzing the myriad and profound effects of O&M activities, the regulating works SEIS cannot provide a complete understanding of the Project.

8.      There exists now between the parties an actual, justiciable controversy in which plaintiffs are entitled to a declaration of their rights, a declaration of the Corps' obligations, and further relief because of the facts and circumstances hereinafter set forth.

9.      Plaintiffs have standing to assert their claims, have exhausted all applicable remedies, and file this Complaint within all applicable statutes of limitations.

## 2.      PARTIES

10.      Plaintiff NATIONAL WILDLIFE FEDERATION is the nation's largest member-supported non-profit conservation advocacy and education organization, working with more than four million members, partners, and supporters.  NWF is organized under the laws of the District of Columbia and is headquartered in Reston, Virginia.  It has field and regional offices throughout the United States and affiliate organizations in forty-nine states and territories, including the Mississippi River's watershed states of Minnesota, Wisconsin, Iowa, Illinois, Missouri, Kentucky, Arkansas, Tennessee, Mississippi, and Louisiana.  NWF's mission is to inspire Americans to protect wildlife for our children's future.  NWF promotes this purpose through numerous conservation programs that seek to restore habitats and ecosystems upon which people and wildlife depend, including the self-renewing processes of the nation's rivers.  These processes include healthy headwaters sending clean water downstream, productive floodplains and wetlands that alleviate flooding and act as filters for pollutants that run off the land, and natural flow regimes that synchronize and sustain life in and along the nation's rivers.  NWF works to restore rivers' natural functions so they will be better able to support the people and biological communities that depend on them.  NWF takes an active role in monitoring legislation and the actions of state and federal agencies, including the U.S. Army Corps of Engineers, that affect watershed management.  NWF works extensively on navigation, flood protection, and species and habitat protection issues on the Upper Mississippi River System.

11.      NWF's members currently use and enjoy and plan to continue to use and enjoy the Upper Mississippi River System and associated floodplains and wetlands for health, recreation, scientific, economic, and aesthetic purposes.  Members derive these benefits from drinking,

fishing, hunting, boating, swimming, study, contemplation, wildlife observation, photography, and other activities in and around the waters of the Upper Mississippi River System.  In addition, NWF members are vitally interested in preservation of the wildlife populations which are threatened by the Project.  Many NWF members reside in the states that border the Mississippi River and its tributaries and are at risk from increased flooding.  The above-described interests of NWF's members are being adversely affected and irreparably injured by the Corps' carrying out of the Project and proceeding with the New Projects without first preparing a comprehensive SEIS as required by NEPA.  A court order granting plaintiffs relief will redress some of these injuries.

12.     Plaintiff PRAIRIE RIVERS NETWORK ("PRN") is a community organization in Illinois and a state affiliate of NWF dedicated to river protection, conservation, and restoration. PRN has members who reside throughout Illinois who are directly affected by the Project. Members are vitally interested in preservation of wildlife populations in the Upper Mississippi River System, many of which are threatened by the Project.  In addition, PRN members work in the floodplain and are therefore at risk from increased flooding. The Project harms and will continue to harm the interests of PRN members.  A court order granting plaintiffs relief will redress some of these injuries.

13.     Plaintiff MISSOURI COALITION FOR THE ENVIRONMENT ("MCE") is a community organization in Missouri that works to protect and restore the environment through education, public engagement, and legal action.  MCE has members who reside throughout Missouri who are directly affected by the Project.  MCE's members use the Project area for aesthetic, scientific, historic, cultural, recreational, and spiritual enjoyment.  In addition, members are vitally interested in preservation of the wildlife populations which are threatened by the Project.  Finally, many MCE members live in the floodplain and are therefore at risk from increased flooding. The Project harms and will continue to harm the interests of MCE members. A court order granting plaintiffs relief will redress some of these injuries.

14.     Plaintiff RIVER ALLIANCE OF WISCONSIN ("RAW") is a conservation organization advocating for the protection, enhancement, and restoration of Wisconsin's watersheds and rivers.  RAW has more than 2,500 members including individuals, organizations, and businesses.  These members are directly affected by the Project because they use the Project area for aesthetic, scientific, historic, cultural, recreational, and spiritual enjoyment.  In addition, members are vitally interested in preservation of the wildlife populations which are threatened by the Project.  The Project harms and will continue to harm the interests of RAW members.  A court order granting plaintiffs relief will redress some of these injuries.

15.     Plaintiff GREAT RIVERS HABITAT ALLIANCE ("Great Rivers") is a non-profit membership organization dedicated to protecting the historic, 100-year flood plain of the Upper Mississippi River and its major tributaries and the irreplaceable wildlife habitat and flood-water storage it provides.  Great Rivers' members own land within the flood plain of the confluence of the Mississippi River and its major tributaries, and regularly use the flood plain for recreation, aesthetic enjoyment, water fowl hunting, and other purposes, or own or lease real property affected by flood management of the Mississippi River.  For years, Great Rivers and its members have worked to preserve and protect the flood plain, and to reduce the negative environmental impacts of floodway management by the Corps, including the Project.  Great Rivers and its members are directly affected by the Project because they use the Project area for aesthetic, scientific, historic, cultural, recreational, and spiritual enjoyment.  Great Rivers' members are vitally interested in preserving the wildlife populations which are threatened by the Project.  The Project harms and will continue to harm the interests of Great Rivers' members.  A court order granting plaintiffs relief will address some of these injuries.

16.     Plaintiff MINNESOTA CONSERVATION FEDERATION ("MCF") ") is a non-profit organization in Minnesota and a state affiliate of the National Wildlife Federation dedicated to the conservation of Minnesota's natural resources and the preservation of the state's rich outdoor heritage.  MCF has members who reside in Minnesota and are directly affected by the Project.  MCF's members use the Project area for aesthetic, scientific, historic, cultural,

recreational, and spiritual enjoyment.  In addition, MCF's members are vitally interested in the preservation of wildlife populations and their habitats in the Upper Mississippi River System, many of which are threatened by the Project.  MCF members live, work, and maintain structures in the floodplain, and are therefore at risk from increased flooding.  The Project harms and will continue to harm the interests of MCF members.  A court order granting plaintiffs relief will redress some of these injuries.

17.     Plaintiffs' injuries are fairly traceable to the Corps' actions.  The Project harms plaintiffs' use of the Upper Mississippi River System area for aesthetic, scientific, recreational, and spiritual enjoyment because it causes extensive habitat degradation and destruction, a decline in water quality, degradation of the floodplain, and increased risks of flooding.  The Project also adversely affects numerous wildlife populations, including populations of threatened and endangered species.  These injuries are actual, concrete, and imminent.  Plaintiffs have no plain, speedy, or adequate remedy at law.

18.     Defendant LT. GENERAL THOMAS P. BOSTICK is the Chief of Engineers of the U.S. Army Corps of Engineers and is sued herein in his official capacity.  He is charged with the supervision and management of all Corps decisions and actions, including the Project.

19.     Defendant BRIGADIER GENERAL DUKE DELUCA is the Commander of the Mississippi Valley Division of the U.S. Army Corps of Engineers and is sued herein in his official capacity.  He is charged with the supervision and management of all Mississippi Valley Division decisions and actions, including the Project.

20.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS ("Corps") is an agency of the federal government.  The Corps has the primary authority for construction and maintenance of federal navigation and flood control projects throughout the nation, including the Project.

## IV.     LEGAL BACKGROUND

21.     The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., is the basic national charter for environmental protection.  Title II of NEPA establishes the Council on

Environmental Quality (CEQ), 42 U.S.C. § 4342, which is charged with ensuring that federal agencies implement and comply with the provisions of NEPA.  42 U.S.C. § 4344.  In furtherance of this responsibility, CEQ publishes regulations prescribing processes for complying with NEPA. See 40 C.F.R. §§ 1500.1-1508.28 ("CEQ regulations").  The CEQ regulations are mandatory and binding upon all federal agencies, including defendants.  40 C.F.R. § 1500.3.

22.     NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS must describe all direct, indirect, and cumulative environmental impacts of the proposed action, any adverse and unavoidable effects, and alternatives to that action, as well as respond to public comments.  Id.; 40 C.F.R. §§ 1502.9, 1508.8(b).

23.     An EIS also must "state how alternatives considered in it and decisions based on it will or will not achieve" the policy goals set forth in sections 101 and 102(1) of NEPA, and other environmental laws and policies.  40 C.F.R. § 1502.2(d).  The policy goals of NEPA include a continuing responsibility on the part of the federal government to use all practicable means to:

(1)     fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2)     assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings; [and]

(3)     attain the widest range of beneficial uses of the environment without degradation, risk to . . . health or safety, or other undesirable and unintended consequences . . . .

42 U.S.C. § 4331(b).

24.     An EIS is "more than a disclosure document."  40 C.F.R. § 1502.1.  It is intended to be "action-forcing," ensuring that the government carefully considers the environmental consequences of its actions and makes informed decisions that "minimize adverse [environmental] impacts" and "enhance the quality of the human environment."  *Id.*  The EIS "shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made."  40 C.F.R. § 1502.5.

25.     An agency's NEPA obligations continue even after an EIS is finalized.  CEQ regulations and the Corps' NEPA regulations provide that the agency must continue to evaluate potential environmental impacts of its projects and must prepare a supplemental EIS ("SEIS") whenever:

    (i)     The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

    (ii)    There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c); 33 C.F.R. § 230.13(b).  Where, as here, an EIS is "more than 5 years old," it should be "carefully re-examined" to determine if a supplement is required.  46 Fed. Reg. 18026 (Mar. 23, 1981), as amended 51 Fed. Reg. 15618 (Apr. 25, 1986), Question 32. Supplemental EISs are critical to fulfilling NEPA's purpose "because '[t]he entire efficacy of the EIS process is called into question when changes are made to a project after the publication of a final impact statement." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 n. 14 (1989), quoting from Andreen, "In Pursuit of NEPA's Promise: The Role of Executive Oversight in the Implementation of Environmental Policy," 64 Indiana L.J. 205, 247-248 (1989).

26.     In *Marsh*, the Supreme Court stated that "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance:  if there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS *must* be prepared."  490 U.S. at 374, quoting from 42 U.S.C. § 4332(2)(C) (emphasis added).  New information is significant enough to require an SEIS if it "'presents a seriously different picture of the environmental impact of the proposed project from what was previously envisioned.'"  *Louisiana Wildlife Fed'n v. York*, 761 F.2d 1044, 1051 (5th Cir. 1985), quoting from *Wisconsin v. Weinberger*, 745 F.2d 412, 421 (7th Cir. 1984).

27.     When deciding whether to prepare a supplemental EIS, the agency must "take a hard look" at any evidence that becomes available after the original EIS is prepared.  *Marsh*, 490

U.S. at 385. "An agency has met its 'hard look' requirement if it has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Sierra Club v. United States Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002), quoting from *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). If an agency "fail[s] entirely to consider an important aspect of the problem," it has not taken the requisite hard look. *Id.*

28.     Under certain circumstances, agencies may "tier" environmental impact statements off of one another. "Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the" new project. 40 C.F.R. § 1508.28. Tiering "is appropriate when the sequence of statements or analyses is:

> (a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement of analysis of lesser scope or to a site-specific statement or analysis.
>
> (b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

*Id.*

29.     Tiering is *inappropriate*, however, when there has been "a material change in circumstances or a departure from the policy covered in the overall EIS." *Minnesota Public Interest Research Group v. Butz* ("*Minnesota PIRG*"), 498 F.2d 1314, 1323 n. 29 (8th Cir. 1974) (emphasis added); *Association of Public Agency Customers, Inc. v. Bonneville Power Administration* ("*APAC*"), 126 F.3d 1158, 1184 (9th Cir. 1997) ("*significant circumstantial change* is the triggering factor requiring a new or supplemental EIS" instead of merely tiering to a prior "programmatic EIS" (emphasis added)); *Salmon River Concerned Citizens v. Robertson* ("*Salmon River*"), 32 F.3d 1346, 1356 (9th Cir. 1994) ("A comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or project-specific impact

statement, unless *new and significant environmental impacts arise* that were not previously considered" (emphasis added)).  Under those circumstances, "an individual EIS for each [subsidiary project] would . . . be *required*."  *Minnesota PIRG*, 498 F.2d at 1323 n. 29 (emphasis added).

## V.    HISTORICAL AND FACTUAL BACKGROUND

30.     The Mississippi River watershed drains 1,245,000 square miles, including all or parts of thirty-two states and two Canadian provinces.  The Upper Mississippi River System ("UMRS"), which includes the upper portion of the Mississippi River (from northern Minnesota to its confluence with the Ohio River), as well as portions of the Illinois, Kaskaskia, Minnesota, St. Croix, and Black Rivers, is a vital national resource with important uses for agriculture, industry, recreation and wildlife.  The UMRS supports hundreds of thousands of acres of bottomland forest, wetlands, and aquatic habitats, and "more than 300 species of birds, 57 species of mammals, 45 species of amphibians and reptiles, 150 species of fish, and nearly 50 species of mussels."  Final Integrated Feasibility Report and Programmatic Environmental Impact Statement for the UMR-IWW System Navigation Feasibility Study, 2004 at ii.  The Mississippi River Valley is a major bird migration corridor; nearly half of North America's migratory waterfowl and shorebirds depend upon it for seasonal or year-round habitat.  *Id.*  Recreational opportunities in and around the rivers draw millions of visitors each year, and the rivers supply water to nearby cities, agricultural areas, and industries.  Finally, these rivers provide a commercial channel, carrying millions of tons of waterborne commerce each year, including fifty percent of the nation's corn and nearly half its soybean exports in 2002.  *Id.*

31.     A series of Rivers and Harbors Acts beginning in 1824 tasked the Corps with improving navigation in the rivers of the Upper Mississippi River System.  Before the nation developed a sophisticated road and rail network, the rivers were more important than they are today for moving timber, coal, cotton, and other agricultural products down the river and to the port of New Orleans, the gateway to international markets.  Originally, the Corps' projects consisted of removing snags, sandbars, and other obstacles from the rivers.  In the 1830s, the

Corps began dredging and building wing dikes, which are long piles of stones extending from one riverbank into the river at an angle perpendicular to the water flow. Wing dikes were the first example of river training structures, which can reduce the need for dredging by controlling the shape of the river and directing the water flow into the navigation channel, where the concentrated flow and suspended sediment scour the soil and sand of the river bottom and deepen the channel. In 1880, lock and dam construction began.

32.     The Rivers and Harbors Act of 1930 authorized the nine-foot channel project, calling on the Corps to maintain a navigation channel nine feet deep and 400 feet wide. Construction in the Upper Mississippi River System accelerated, and in the 1930s alone the Corps added twenty-three dams to the existing three on the Mississippi River.

33.     As commercial needs changed and the natural environment deteriorated, a series of Water Resources Development Acts ("WRDAs") authorized additional projects in the Upper Mississippi River System, including further construction of projects aimed at protecting the environment. For example, the 1986 WRDA authorized the Corps' Environmental Management Program to restore and improve the ecological condition of the Upper Mississippi River System. The 1990 WRDA directed the Corps to prioritize environmental protection as one of its primary goals in all water resources projects. The 2007 WRDA authorized the Corps to carry out additional extensive restoration projects to improve the health of the Upper Mississippi River System. However, to date no projects have been carried out under this 2007 WRDA authority.

34.     The Corps issued four EISs for the nine foot channel Project between 1974 and 1976. Each was prepared by one of the district offices (St. Louis, Rock Island, or St. Paul), and therefore addressed only the part of the Project in that district's own geographical area. In 1997, the Corps' St. Paul District issued another EIS, but that EIS only addressed maintenance activities (and none of the operations or regulating works activities) conducted in the St. Paul District. The vast majority of the river training structures are located not in the St. Paul District but further south in the Rock Island and St. Louis districts. In addition, more than half of the Mississippi River locks and dams are located in the Rock Island and St. Louis districts. The 1997 EIS did not

analyze how the Corps' activities in the St. Paul District might interact with those in the other districts, and the EIS itself acknowledged this shortcoming:  "The major *unresolved* issue is the *cumulative* impacts of the continued operations and maintenance of the 9-foot navigation channel project."  1997 EIS at 1-4 (emphasis added).  Despite the Corps' failure to ever address this "major unresolved issue" in an EIS for the Project, and despite the significant environmental and project changes that have occurred since 1997, let alone since the mid-1970s, the Corps has yet to prepare or even plan additional EISs addressing O&M activities.  To plaintiffs' knowledge, the only new EIS the Corps plans to prepare is the SEIS addressing only the Project's regulating works activities.  At present, the Corps plans to exclude from analysis in the SEIS all O&M activities, including dredging and water level and flow control through the operation of locks and dams.  *See,* U.S. Army Corps of Engineers, Regulating Works: Supplemental Environmental Impact Statement website, www.mvs.usace.army.mil/Missions/Navigation/SEIS.aspx.

## VI.    CURRENT PROJECT ACTIVITIES

35.    Construction, operations, and maintenance for the nine-foot channel Project continue to this day, but the Project looks much different than it did thirty or even fifteen years ago, with different types of structures and far more of them.  For example, the Corps has developed new river training structures.  Bendway weirs, which the Corps began building in 1990, are placed under water on the outside of a river bend, angled upstream.  They direct water toward the inside of the bend, which prevents the navigation channel from migrating outward.  After 2000, the Corps began using chevrons, which are arch-shaped dikes positioned away from the river banks, with the curve of the arch pointed upstream.  Chevrons split the flow of the river, scouring the main channel and providing a secondary channel on the other side of the chevron near the riverbank.  The original EISs did not consider the effects of these structures because they had not yet been invented.

36.    In addition, the Corps has added hundreds of structures to the Upper Mississippi River System in the past three decades.  Between 1980 and 2009, the Corps built at least 380 new river training structures in the Middle Mississippi, including 40,000 feet of wing dikes and bendway weirs between 1990 and 1993.  The Corps also built twenty-three chevrons in the

Middle Mississippi between 2003 and 2010.  The Corps also continues to operate and maintain locks and dams throughout the Upper Mississippi River System, and continues to dredge the river and dispose of those dredged materials.  In October 1989 the new Melvin Price Dam with a 1,200-foot lock became operational. The opening of the second 600-foot lock at the facility followed in June 1994.

37.     In April, 2014, the Corps approved EAs and FONSIs for three new projects: the Monsenthein/Ivory Landing Regulating Works Project, the Eliza Point/Greenfield Bend Regulating Works Project, and the Dogtooth Bend Regulating Works Project ("New Projects"). These New Projects involve constructing multiple rootless dikes, miles of bankline revetments, and twelve bendway weirs.  Monsenthein/Ivory Landing Final EA and FONSI at 5; Eliza Point/Greenfield Bend Final EA and FONSI at 5; Dogtooth Bend Final EA and FONSI at 5. None of these structures was examined in any previous EIS.

38.     The EAs for the three New Projects claim to tier off the 1976 EIS. Monsenthein/Ivory Landing Final EA and FONSI at 2-3; Eliza Point/Greenfield Bend Final EA and FONSI at 2-3; Dogtooth Bend Final EA and FONSI at 2-3.  However, the 1976 EIS cannot serve as the basis for tiering because it is obsolete.  As the Corps concedes, its 1976 EIS requires supplementation, in the form of an SEIS, because "there are significant new circumstances and information on the potential impacts of the Regulating Works Project on the resources, ecosystem, and human environment to warrant the preparation of" an SEIS.  Monsenthein/Ivory Landing Final EA and FONSI at 2; Eliza Point/Greenfield Bend Final EA and FONSI at 2; Dogtooth Bend Final EA and FONSI at 2.  As a result, tiering to the 1976 EIS is *impermissible*.  *Minnesota PIRG*, 498 F.2d at 1323 n. 29; *APAC*, 126 F.3d at 1184; *Salmon River*, 32 F.3d at 1356.

39.     It is not enough that the EAs for the New Projects allegedly "incorporated new information and circumstances . . . to the *greatest extent possible*." Monsenthein/Ivory Landing Final EA and FONSI at 3; Eliza Point/Greenfield Bend Final EA and FONSI at 3; Dogtooth Bend Final EA and FONSI at 3.  Nor may the Corps take action on the New Projects now, before any Supplemental EIS is prepared, and then impose additional mitigation measures in the future based on what "the analyses undertaken as part of the SEIS process reveal." *Id*.  Instead, the Corps is "required" to prepare "an individual EIS for each" specific project within the regulating works project *before* approving or building those projects.  *Minnesota PIRG*, 498 F.2d at 1323 n. 29.

## VII.   CURRENT ECOLOGICAL CONDITIONS, POLITICAL CONTEXT, AND KNOWLEDGE ABOUT THE PROJECT'S EFFECTS

40.      Not only the Project itself, but also the circumstances surrounding it and the state of our knowledge about its effects, have changed substantially since the original EISs were prepared in the 1970s.  Since 1986, many years after the Project EISs were completed, the Corps itself, along with the U.S. Fish and Wildlife Service, U.S. Geological Survey, U.S. Environmental Protection Agency, and five states of the Upper Mississippi River System region, have been monitoring the rivers' ecological health through the Long Term Resource Monitoring Program (LTRMP).  The LTRMP "has developed one of the most extensive and comprehensive data sets on any large river system in the world."  Long Term Resource Monitoring Program, Status and Trends of Selected Resources of the Upper Mississippi River System, 2008 ("2008 Report") at 9.  Data from the LTRMP have been examined in at least 324 technical reports, sixty-five peer-reviewed publications, and publicly available management tools and models.  *Id*. at 17.  The program is ongoing, and continues to provide new information regarding the health of the Upper Mississippi River System and the effects of the Project.

41.      Two reports prepared by the LTRMP demonstrate the significance of the new data, the extent of the ecological decline of the Upper Mississippi River System, and the Project's role in that decline.  Both reports cite the Project as a major factor negatively affecting the health of the UMRS.  For example, the 2008 Report states that the Project activities are a "stressor" and "heavily influence" the condition of the Upper Mississippi River System, which is ecologically impaired in "all parts of the system."  2008 Report at 3, 9, 14, 19, 43.  The 1999 Report cites the Project as a major and sometimes "chief" cause of all six ecological health indicators being in an "impacted" or "degraded" state.  Ecological Status and Trends of the Upper Mississippi River System 1998, 1999 ("1999 Report") at 16-2, 16-6, 16-8, 16-10, 16-11.  In a 1997 report to Congress, the Corps acknowledged that "conditions at even the most healthy sites within the [Upper Mississippi River System] are at least partially artificial, non-sustainable, and in a recognized state of degradation."  Rock Island District, U.S. Army Corps of Engineers, Report to

Congress, An Evaluation of the Upper Mississippi River System Environmental Management Program (Dec. 1997) at 2-3.

42.     The 1999 Report also highlights the extent to which newly available scientific information continues to increase our understanding of how different activities and processes in the river interact. *See, e.g.*, Report at 16-6 (data are "now beginning to reveal" how much habitat fish species need); 16-10 ("a growing body of ecological information indicates how important . . . annual flood zone inundation is"); 16-12 ("[t]his report marks the first time broad ecological criteria have been used to assess the reaches of the [Upper Mississippi River System]").

43.     The 2008 Report concludes that "[t]he current condition of the [Upper Mississippi River System] is heavily influenced by its agriculture-dominated basin and by the dams, channel training structures, dredging, and levees that regulate flow distribution." 2008 Report at 3. While some conditions have improved significantly since the 1960s due to improvements in sewage treatment and land use practices, the [Upper Mississippi River System] is still in a highly degraded state and faces substantial challenges including:

1.     High sedimentation rates in some backwaters and side channels;
2.     An altered hydrologic regime resulting from modifications of river channels, the floodplain, and land use within the basin, and from dams and their operation;
3.     Loss of connection between the floodplain and the river, particularly in the southern reaches of the [Upper Mississippi River System];
4.     Non-native species (e.g., common carp [Cyprinus carpio], Asian carps [Hypophtalmichthys spp.], zebra mussels [Dreissena polymorpha]);
5.     High levels of nutrients and suspended sediments; and
6.     Degradation of floodplain forests."

*Id.* at 3.

44.     The 2008 Report also describes how our understanding of the effects of locks and dams has changed since the original EISs were completed. These structures were initially thought to have beneficial ecological effects because they created new aquatic habitats and "a short-term increase in river productivity." *Id.* at 15. See also, e.g., Rock Island EIS (1974) at I (the "impact of operating the lock and dam system is largely beneficial to both the natural and human

environment"). This is no longer an accurate assessment. Instead, it is now clear that construction and operation of the locks and dams is a major cause of the severe ecological decline of the Upper Mississippi River System. 2008 Report at 15, 83. Largely as a result of changes caused by the Project, "[i]n all reaches, sedimentation has filled-in many backwaters, channels, and deep holes. In the lower reaches, sediments have completely filled the area between many wing dikes producing a narrower channel and new terrestrial habitat. Erosion has eliminated many islands, especially in impounded zones." *Id*. at 6.

45.    While erosion and sediment deposition can be natural ecological processes, the Project has fundamentally changed the natural processes of the rivers, thoroughly transforming the UMRS and its ecosystems. Instead of a free-flowing river, the upper Mississippi is now a series of pools, with flow and water levels controlled by locks and dams. This slower flow of water causes sediment to accumulate in areas such as backwater, side channel, and braided habitats, making river depth more uniform. Since many animals require different, specific depths of water, or the absence of sediment, the lack of habitat diversity is a significant and growing problem. The areas between wing dams often completely fill with sediment, eliminating aquatic habitat altogether. In addition, sediment often connects sandbars or islands to the riverbank, leaving birds' nests vulnerable to land-based predators.

46.    Since the original EISs were completed, hundreds of studies have been published addressing large river sediment transport and deposition, and sedimentation is now well recognized as one of the river's most critical ecological problems. See, e.g., DeHaan, H.C. 1998, "Large River Sediment Transport and Deposition: An Annotated Bibliography," U.S. Geological Survey, Environmental Management Technical Center, Onalaska, Wisconsin, April 1998, LTRMP 98-T002 (identifying more than 250 scientific studies addressing large river sediment transport and deposition published since 1976); Pierre Y. Julien and Chad W. Vensel, Department of Civil and Environmental Engineering Colorado State University, "Review of Sedimentation Issues on the Mississippi River, DRAFT Report Presented to the UNESCO:" ISI, November 2005 (referencing more than 100 studies published between 1979 and 2005). Thus, there is much more

information available now than there was in the 1970s – when the original EISs were prepared – about how the Project affects sedimentation and how sedimentation, in turn, affects wildlife and the quality of the environment.

47.     It is now well-recognized in the scientific community that river training structures play a significant role in increasing flood heights.  The first studies to advance the theory that instream structures cause increased river stages were published in 1975.  Therefore, the original EISs did not discuss this possibility.  However, many peer reviewed scientific studies demonstrate that such structures on the Upper Mississippi River System have significantly increased flood risks for nearby communities.  Between 1986 and 2013, at least forty-eight studies attributed increasing flood heights to the construction of instream structures, and at least seventeen studies between 2000 and 2013 discussed this effect on the Mississippi River specifically.  In the Netherlands, the government has begun modifying river training structures on the Rhine River to reduce this recognized risk.  *See* GAO Report at 41.  The Corps claims to have commissioned "independent technical reviews" that question the connection between river training structures and increased flood risk.  However, studies commissioned by the Corps cannot be sufficiently independent to resolve this issue.  The Corps is obligated to consider the vast body of research conducted by independent scientists and vetted by peer review.

48.     The EIS prepared by the St. Louis District in 1976 noted that some impacts of the Project were not "adequately assessed" or "not yet fully understood," and that reassessment of the Project would probably be necessary within five years. See *id*. at 23.  The new information described in the preceding paragraphs is especially important in light of the Corps' recognition in the 1970s that it did not fully understand the impacts of the Project.

49.     The EAs for the New Projects describe "new circumstances and information" that necessitate an SEIS for the Corps' regulating works activities.  *See* Dogtooth Bend Final EA and FONSI at 2-3 ("significant new circumstances and information on the potential impacts of the Regulating Works Project" include newly listed threatened and endangered species, new information "on the impacts of river training structures and dredging on fish and

macroinvertebrates, and new information "on the effects of navigation on fish and wildlife resources"); Monsenthein/Ivory Landing Final EA and FONSI at 2-3 (same); Eliza Point/Greenfield Bend Final EA and FONSI at 2-3 (same).  However, these changes and information also pertain to the effects of the Corps' O&M activities.  An SEIS for the Project cannot be complete unless it analyzes *both* sets of activities and their cumulative effects.

50.    Because it has thoroughly transformed the Upper Mississippi River System ecosystems, the Project has had a dramatic adverse effect on local wildlife populations.  Between 1976 and 1991, at least five species found in these ecosystems were added to the list of threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. section 1531 et seq.  In May 2000, the U.S. Fish and Wildlife Service ("FWS") released a Biological Opinion concluding that the Project would jeopardize the continued existence of the Higgins eye pearly mussel and the pallid sturgeon, result in the incidental take of the least tern and the winged mapleleaf mussel, and would likely adversely affect the bald eagle, the Indiana bat, and the decurrent false aster.  In 2012, four species of freshwater mussel, all of which could be present in the Upper Mississippi River System, were added to the endangered species list.  Plaintiffs understand that the Corps has not consulted with FWS regarding the potential effects of the Project on these mussels, even though the ESA requires such consultation.  16 U.S.C. § 1536; 50 C.F.R. §§ 402.12-402.14.

51.    Mussels play a key role in aquatic environments.  They are an important food source for mammals as well as fish, and they filter the water, removing phytoplankton, bacteria, and fungi.  Mussels also attach themselves to the river bottom, where they help to stabilize the river bed.  Algae and insect larvae use mussel shells as a home.  The algae and larvae, in turn, attract fish who feed on them.  Dredging and disposal of dredged material kills mussels, as does clearing and snagging and building channel structures.  In addition, zebra mussels, an exotic species brought in on upstream barge traffic, have spread throughout the Upper Mississippi River System, and are a serious threat to native freshwater mussels.

52.    Numerous other species found in the Upper Mississippi River System are listed under individual states' endangered species acts.  For example, Wisconsin's threatened and

endangered species list includes at least sixteen species of fish, ten species of mussel, two species of turtle, and a frog found in the Upper Mississippi River System.  Minnesota's list includes at least ten species of fish, four species of turtle, and a number of different mussels found in the Upper Mississippi River System.  Iowa, Illinois, and Missouri all list a number of fish, turtles, snakes, and mussels found in the Upper Mississippi River System as state threatened and endangered species.  Many species were listed after the 1970s EISs were completed.

53.     The Upper Mississippi River System is also home to a number of birds that play important ecosystem roles, including the bald eagle, the little blue heron, and a number of species of sandpiper, warbler, and sparrow.  The FWS' 2000 Biological Opinion found that continued operation of the Project would result in the incidental take of the least tern because channel training and flow control activities have drastically reduced the least terns' nesting and foraging habitat, and diminished nutrient cycling in the river leading to a decrease in the populations of small fish.  River training structures have also changed the flow of the river such that least tern nesting sites are more vulnerable to land-based predators.  2000 Biological Opinion at 56-63.

54.     A number of bird species depend upon the Upper Mississippi River System and need wet mudflats or shallow water for foraging.  As discussed above, the Project has profoundly changed the natural flow and rhythms of the Upper Mississippi River System's rivers, leading to fewer shallow areas and virtually no seasonal inundation of the floodplain.  This leaves birds that depend upon shallow waters and wet mudflats without a foraging ground.  Many of these birds, like the least tern, require sandbars or beaches for nesting.  As described above, the Project activities have eliminated many such areas.  "Dredging and channelization" are two of the main reasons that so many migratory and resident shorebirds are threatened by habitat loss in the Upper Mississippi River System.  See, e.g., Potter, B. A., R. J. Gates, G. J. Soulliere, R. P. Russell, D. A. Granfors, and D. N. Ewert, "Upper Mississippi River and Great Lakes Region Joint Venture Shorebird Habitat Conservation Strategy," U. S. Fish and Wildlife Service, 2007.  See also Nelson and Wlosinski, "Wetland Birds of the Upper Mississippi River National Wildlife and Fish Refuge," 61 Passenger Pigeon 299, 305 (1999) (concluding that habitat loss "is a constant

problem due to the mandated operation of the commercial navigation channel, the continued inundation and aging of the navigation pools, and decline of the bottomland forest with minimal regeneration and human disturbance").

55.     Since the 1975 Project EISs were completed there have been significant documented changes in rainfall, streamflow, and climate within the Upper Mississippi River System.  For example, in March 2005, the U.S. Geological Survey released a study showing upward trends in rainfall and streamflow for the Mississippi River.  USGS Fact Sheet 2005-3020, "Trends in the Water Budget of the Mississippi River Basin, 1949-1997."

56.     In 2009, the U.S. Global Change Research Program issued a report showing that the Midwest experienced a thirty-one percent increase in very heavy precipitation events (defined as the heaviest one percent of all daily events) between 1958 and 2007.  Thomas R. Karl, Jerry M. Melillo, and Thomas C. Peterson, (eds.), "Global Climate Change Impacts in the United States," Cambridge University Press, 2009 at 32 (available at www.globalchange.gov/usimpacts).  That study also reports that during the past fifty years, "the greatest increases in heavy precipitation occurred in the Northeast and the Midwest."  *Id*.  Models predict that heavy downfalls will continue to increase:

> Climate models project continued increases in the heaviest downpours during this century, while the lightest precipitation is projected to decrease. Heavy downpours that are now 1-in-20-year occurrences are projected to occur about every 4 to 15 years by the end of this century, depending on location, and the intensity of heavy downpours is also expected to increase. The 1-in-20-year heavy downpour is expected to be between 10 and 25 percent heavier by the end of the century than it is now. . . . Changes in these kinds of extreme weather and climate events are among the most serious challenges to our nation in coping with a changing climate.

*Id*.  Conversely, droughts may also increase in their frequency and severity.

57.     Since the original Project EISs were completed, there have been significant and fundamental changes in federal law and policy regarding wetlands and floodplain management. For example, in 1977, then-President Carter issued Executive Order 11990, which directs each federal agency, in carrying out agency policy, to minimize the destruction, loss, or degradation of wetlands, and to preserve and enhance the beneficial values of wetlands.  The same year he also

issued Executive Order 11988, directing federal agencies to "reduce the risk of flood loss," to "minimize the impact of floods on human safety, health and welfare," and to "restore and preserve the natural and beneficial values served by floodplains."

58.     In 1986, Congress enacted a number of fundamental changes to the Corps' civil works program.  For example, Congress established specific mitigation provisions for Corps civil works projects.  WRDA of 1986 (P.L. 99-662), Section 906, 33 U.S. C. § 2283.  Congress also authorized the Corps to modify existing water resources projects and operations to improve the quality of the environment.  WRDA of 1986 (P.L. 99-662), Section 1135, 33 U.S.C. § 2309(a).  In an effort to rectify past harm caused by the Project, Congress also established the Upper Mississippi River System Environmental Management Program to help replace and enhance habitat and implement long term resource monitoring on the Upper Mississippi and Illinois Rivers. WRDA of 1986 (P.L. 99-662), section 1103, 33 U.S.C. § 652.

59.     In 1990, the WRDA established "environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects."  33 U.S.C. § 2316(a) (emphasis added).  The Act further establishes "an interim goal of no overall net loss of the Nation's remaining wetlands base, as defined by acreage and function, and a long-term goal to increase the quality and quantity of the Nation's wetlands, as defined by acreage and function."  33 U.S.C. § 2317(a)(1).

60.     In 2007, Congress enacted new and stricter mitigation requirements for Corps civil works projects and directed that those requirements would apply to all project proposals submitted to Congress and to all projects reevaluated under NEPA.  WRDA of 2007 (P.L. 110-114), section 2036, 33 U.S.C. § 2283(d).  These enhanced standards include complying with the mitigation requirements established for the Clean Water Act section 404 regulatory program, which were substantially modified in 2008 (33 CFR Parts 325 and 332, 40 CFR Part 230). Congress also established a new federal water policy that, among other things, requires all Corps projects to protect and restore the environment and avoid the unwise use of floodplains.  WRDA of 2007 (P.L. 110-114), section 2031, 42 U.S.C. 1962-3.

61.     Recognizing that significant efforts would be required to maintain the environmental sustainability of the UMRS due to the ecological damage being caused by the Project, in 2007 Congress also enacted a large scale restoration program for the UMRS.  The WRDA of 2007 authorizes $1.7 billion to "ensure the environmental sustainability of the existing Upper Mississippi River and Illinois Waterway System" and directs the Secretary of the Army to modify "the operation of the Upper Mississippi River and Illinois Waterway System to address the cumulative environmental impacts of operation of the system and improve the ecological integrity of the Upper Mississippi River."  WRDA of 2007 (P.L.110-114), section 8004, 33 U.S.C. § 652 note.

62.     In 1978, CEQ promulgated regulations for implementing NEPA.  Those regulations were revised in 1984.  40 C.F.R. § 1500 et seq.  The Corps promulgated its own regulations for implementing NEPA in 1988.  33 C.F.R. § 230.  The CEQ regulations require, for example, that the Corps analyze the cumulative impacts of its activities (something that even the 1997 EIS notably failed to do).  40 C.F.R. §§ 1508.25, 1508.27.  They also require the Corps to analyze mitigation for unavoidable environmental impacts of its activities.  40 C.F.R. §§ 1502.14, 1502.16, 1508.20.  Both the CEQ regulations and the Corps' regulations require the implementation of mitigation measures adopted in a Record of Decision, and require the monitoring of mitigation efforts to ensure that mitigation is properly implemented.  40 C.F.R. §§ 1505.2, 1505.3; 33 C.F.R. § 230.15.

## VIII.   CLAIM FOR RELIEF

### (Violation of NEPA)

### (Against all Defendants)

63.     Plaintiffs incorporate by reference all preceding paragraphs.

A.     **The Corps' Navigation Channel Project in the Upper Mississippi River System Constitutes a Major Federal Action Significantly Affecting the Quality of the Human Environment.**

64.     A "major federal action" is an action "with effects that may be major and which [is] potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  "Major" reinforces "significantly," but does not have an independent meaning.  *Id.*  "Significance" refers to the action's context and the intensity of its impacts, including its cumulative effects.  40 C.F.R. § 1508.27.

65.     The Project involves dredging, extensive water level manipulation, operation and maintenance of locks and dams, as well as the extensive construction of river training structures in the UMRS.  The Project has extensive, well-recognized, and devastating effects on the aquatic environments of the rivers and on the surrounding floodplains.  Therefore, the Project constitutes "a major federal action significantly affecting the quality of the human environment."

66.     The Corps has acknowledged that the Project constitutes "a major federal action significantly affecting the quality of the human environment," and that it is therefore subject to NEPA, by preparing four EISs in the mid-1970s and another EIS for one district in 1997.  In addition, The U.S. District Court for the Western District of Wisconsin has ruled that the annual maintenance dredging of the Mississippi River is a major federal action that requires the preparation of an EIS.  *Wisconsin v. Callaway*, 371 F. Supp. 807 (W.D. Wis. 1974); *accord Mississippi v. Marsh*, 710 F. Supp 1488 (S.D. Miss. 1989) (holding that the Corps must prepare an EIS before proceeding with a river maintenance dredging project designed to restore authorized water flow capacity).  Finally, the Corps is currently preparing an SEIS for the regulating works aspect of the Project, but not for its operations and maintenance activities.

B.     **A Supplemental EIS Is Required Because the Corps Has Made Substantial Changes to the Project That Are Relevant to Environmental Concerns.**

67.     The original EISs for the Project examined the impact of maintaining a nine foot deep navigation channel.  However, plaintiffs understand that the Corps now carries out "advance"

maintenance dredging that results in the Corps dredging deeper than the authorized nine feet.  The Corps has never analyzed the environmental effects of maintaining a deeper channel, and does not appear to be doing so in its regulating works EIS.

68.     Since the original EISs were completed, new types of river training structures have been developed, but the original EISs did not address the environmental effects of these new structures.  The number of river training structures in the UMRS has also increased substantially over time, and the original EISs did not analyze the cumulative effects of such a vast number of structures.

## C.     A Supplemental EIS Is Required Because There Are Significant New Circumstances and Information Relevant to Environmental Concerns and Bearing on the Project and its Impacts.

69.     As alleged, the Long Term Research Monitoring Project (LTRMP), which began in 1986, and with which the Corps is a partner, "has developed one of the most extensive and comprehensive data sets on any large river system in the world."  2008 Report at 9.  There is also extensive new scientific evidence regarding sedimentation, the potential flood risks created by river training structures, and the impact of the Project on wildlife populations.

70.     Because of the substantial increase in data and scientific knowledge relevant to the Project's environmental effects since preparation of the original EISs, those EISs are no longer adequate.  "Reliance on stale scientific evidence is sufficient to require re-examination of an EIS." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 95 F.3d 892, 900 (9th Cir. 1996).  See also *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 705 (9th Cir. 1993) (ruling that the agency must "re-examine its chosen alternative" because the "EIS rests on stale scientific evidence").

71.     Since the original EISs were completed, there have been significant and fundamental changes in federal law and policy that put an increasing emphasis on protecting and enhancing the natural environment, particularly wetlands and floodplains.  The CEQ has also promulgated additional regulations regarding NEPA, which require agencies to analyze the

cumulative effects of their activities.  Cumulative effects are particularly important in heavily developed areas such as the Upper Mississippi River System.

72.     The ecological health of the Upper Mississippi River System itself represents perhaps the most significantly changed circumstance.  Environmental conditions have suffered under the cumulative impact of myriad human disturbances and activities.  The Project has fundamentally altered the UMRS and sent it into severe ecological decline.  Water quality is poor in many regions, sedimentation has become an increasing problem, and the list of endangered species in the area continues to grow.

73.     While determining the significance of new information is a "factual question requiring technical expertise," *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 8 (1st Cir. 2008),  here, the sheer volume of new evidence and the length of time over which it was amassed leaves no question that it is significant and requires the Corps' attention.  In addition, the Corps has acknowledged that an SEIS is required for its regulating works activities.  Those activities are only a subset of the larger nine-foot navigation channel Project, which also includes extensive water level and flow control through the use of locks and dams, and extensive dredging and disposal of materials dredged from the river.  Just as the Corps has determined that significantly changed circumstances require it to prepare an SEIS for its regulating works activities, so too it may not continue operating locks and dams and dredging the river to control its flow and depth without considering how these activities affect the environment, which has changed significantly since the 1970s.

74.     Piecemeal analyses of individual components of the Project, related projects, and the ecological health of the Upper Mississippi River System do not fulfill the Corps' obligation to prepare a comprehensive SEIS for the Project.  The SEIS would include an analysis of potential alternatives to Project activities and a discussion of cumulative effects, both of which other studies lack.

**D.      Because a Supplemental EIS Is Required, New EAs Must Not Tier Off the 1976 EIS.**

75.      EAs may generally tier off either a programmatic EIS (under 40 C.F.R. section 1508.28(a)) or a project-specific EIS (under section 40 C.F.R. 1508.28(b)) for discussion of "general matters" relevant to subsequent, site-specific parts of the *same project* where the surrounding circumstances remain largely the *same*.  40 C.F.R. § 1508.28.

76.      However, as the Corps itself admits, the 1976 EIS requires an SEIS because "there are significant new circumstances and information on the potential impacts of the Regulating Works Project."  Monsenthein/Ivory Landing Final EA and FONSI at 2; Eliza Point/Greenfield Bend Final EA and FONSI at 2; Dogtooth Bend Final EA and FONSI at 2.  As a result, tiering to the 1976 EIS is *impermissible*, and promising to discuss new information in an EA is insufficient. *Minnesota PIRG*, 498 F.2d at 1323 n. 29; *APAC*, 126 F.3d at 1184; *Salmon River*, 32 F.3d at 1356. Instead, the Corps is "required" to prepare "an individual EIS for each" specific project within the Regulating Works Project.  *Minnesota PIRG*, 498 F.2d at 1323 n. 29.

## IX.      PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Adjudge and declare that defendants' approval of new construction under the Regulating Works Program  before the completion of the SEIS is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

2.      Enjoin construction of new river training structures until the SEIS is completed and approved;

3.      Order defendants to comply with NEPA by preparing a supplemental EIS for the entire Project, including all of its operations and maintenance on the Upper Mississippi River System;

///

///

///

3.      Award plaintiffs their reasonable attorneys' fees and costs and expenses incurred

in connection with the litigation of this action; and

4.      Award any other relief that this Court deems just and proper.

Dated:  May 22, 2014                         Respectfully submitted,

s/ *Stephan C. Volker*
STEPHAN C. VOLKER (*pro hac vice* application pending)
Lead Counsel
JAMEY M.B. VOLKER (*pro hac vice* application pending)
LAUREN E. PAPPONE (*pro hac vice* application pending)

LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, California 94612
Tel:     510/496-0600
Fax:     510/496-1366
Email:  svolker@volkerlaw.com
             lpappone@volkerlaw.com
             jvolker@volkerlaw.com

s/ *Bruce A. Morrison*
BRUCE A. MORRISON
GREAT RIVERS ENVIRONMENTAL LAW CENTER
319 North Fourth Street, Suite 800A
St. Louis, Missouri 63102
Tel:     314/231-4181
Fax:     314/231-4184
Email:  bamorrison@greatriverslaw.org

Attorneys for Plaintiffs
NATIONAL WILDLIFE FEDERATION, PRAIRIE
RIVERS NETWORK, MISSOURI COALITION FOR THE
ENVIRONMENT, RIVER ALIANCE OF WISCONSIN,
GREAT RIVERS HABITAT ALLIANCE, and
MINNESOTA CONSERVATION FEDERATION