IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

NATIONAL WILDLIFE FEDERATION,
PRAIRIE RIVERS NETWORK, MISSOURI
COALITION FOR THE ENVIRONMENT,
RIVER ALLIANCE OF WISCONSIN, GREAT
RIVERS HABITAT ALLIANCE, and
MINNESOTA CONSERVATION
FEDERATION,

Plaintiffs,

v.                                          NO.  14-590-DRH-DGW

UNITED STATES ARMY CORP OF
ENGINEERS; LT. GENERAL THOMAS P.
BOSTICK, Commanding General and Chief
of Engineers; MAJOR GENERAL MICHAEL
C. WEHR,[1] Commander of the Mississippi
Valley Division of the Army Corps of
Engineers,

Defendants.

<u>MEMORANDUM AND ORDER</u>

HERNDON, District Judge:

I.     INTRODUCTION

This matter comes before the Court on Plaintiffs' Notice of Motion and

Motion for a Preliminary Injunction (Doc. 14).   Plaintiffs contend that the

Defendants' management of the Upper Mississippi River System ("UMRS") violates

the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*   They

---

[1] Major General Wehr is now the Commander of the Mississippi Valley Division of the United States Army Corps of Engineers and is automatically substituted as a defendant.  *See* Fed. R. Civ. P. 25(d).

seek an injunction halting construction of any new river training structures in the UMRS pending the resolution of this case (Doc. 14-1). Specifically, Plaintiffs contend that the Environmental Impact Statement ("EIS") prepared by Defendant United States Army Corp of Engineers in 1976 has become obsolete, and that the Corps cannot go forward with three proposed new projects in the Middle Mississippi River ("MMR") (the portion of the Mississippi River between its confluence with the Ohio and Missouri Rivers) until it completes a Supplemental Environmental Impact Statement ("SEIS").

Defendants do not dispute the need for an SEIS and expect to have one completed by the end of 2016. But Defendants respond that they have complied with NEPA by analyzing the environmental impacts of the proposed projects in Environmental Assessments ("EAs"), wherein they determined the projects are unlikely to have a significant impact on the human environment. Defendants further contend that they are charged with maintaining a safe and dependable navigation channel on the Middle Mississippi River and that the proposed new projects are in furtherance of that mission.

Plaintiffs filed their motion for a preliminary injunction on July 3, 2014 (Doc. 14). Defendants filed their brief in opposition on July 29, 2014 (Doc. 21). This Court held a hearing on the motion on October 16, 2014, and took the matter under advisement. After carefully considering the arguments and evidence presented by the parties, both in their written submissions and during the hearing, the Court finds and concludes as follows.

## II.     FINDINGS OF FACT

### A.     The Corps, the Middle Mississippi River, and the Environment.

1.     Through a series of acts beginning in 1824, Congress directed the Corps to create and maintain a navigation channel through the Mississippi River of sufficient depth to support year-round navigation.  *See* Act of May 24, 1824, 4 Stat. 32, 33; Act of June 10, 1872, 17 Stat. 347; Act of Mar. 3, 1873, 17 Stat. 560; Act of June 25, 1910, Pub. L. No. 61-262, 36 Stat. 630; Act of Jan. 21, 1927, Pub. L. No. 69-560, 44 Stat. 1010.

2.     For more than 100 years, the Corps has fulfilled that directive.  On the Middle Mississippi River ("MMR"), the Corps relies primarily on "regulating works" such as river training structures (dikes), revetment (bank stabilization), and rock removal, all of which contract the flow of the river so that it scours the river bed.  The Corps supplements these regulating works with operations and maintenance ("O&M") activities, such as dredging, though these are more costly and afford only temporary relief.   The project to obtain and maintain the navigation channel in the Middle Mississippi River, known as the "Regulating Works Project," includes both regulating works and O&M activities.

3.     The Corps first prepared an EIS for the Regulating Words Project in 1976.[2]  The purpose of the EIS was "to investigate environmental changes which have occurred on the Middle Mississippi River that may have been brought about

---

[2] The EIS states that the Mississippi River can be divided by its physical characteristics into three segments — the upper, middle, and lower Mississippi River.  The section known as the Middle Mississippi River "extends from the mouth of the Missouri River to the mouth of the Ohio River, a distance of 195 [river] miles" (AR MVS 22).

by the 9-foot navigation project" (Administrative Record ("AR") MVS 6).  The EIS included analysis of "the continuing attainment and operation and maintenance of a 9-foot-deep by 300-foot-wide navigation channel within the Mississippi River between the Ohio and Missouri Rivers by the use of channel contraction dikes, protective bankline revetments, and any necessary dredging" (AR MVS 6-8; MVS 33-69).

4.    In 2012, the 1976 EIS was reviewed by an interdisciplinary team, called the Project Delivery Team ("PDT"), within the St. Louis District of the Corps.  The PDT members compared the 1976 EIS with the current management of the project, examined potential new information to determine whether the EIS should be supplemented, and ultimately issued a report titled "Draft Review of the 1976 Final EIS:  Mississippi River between the Ohio and Missouri Rivers Regulating Works" (AR MVS 667-712).

5.    The PDT concluded that the project as described in the 1976 EIS had not substantially changed.    Specifically, the PDT noted that while the configuration of dikes can vary widely, the basic configuration feature is the same: "namely, these are rock structures engineered to manage the location of sediment deposition for the purpose of maintaining the 9-foot navigation channel within the Mississippi River" (AR MVS 678).  The PDT also found that the use of bendway weirs, a low level submerged rock dike, was not a substantial change to the project because "the EIS was broadly written and clearly referenced the construction of 'low dikes,'" and the EIS was not limited to the specific structures

4

listed, as it also referenced future dike construction and allowed for flexibility in dike design construction (AR MVS 679).

6.      The PDT report notes that "[w]hile configurations of river training structures have evolved over time to generate more effective results and to generate enhanced environmental benefits, the purpose and function of these structures themselves has changed very little over the years" (AR MVS 699).

7.      The PDT determined, however, that new information and circumstances relevant to environmental concerns justified preparation of an SEIS (AR MVS 684-87; MVS 689-98; MVS 700).  Specifically, the new information the PDT considered included: (1) the environmental effects of river training structures on benthic invertebrates and fisheries; (2) the importance of the floodplain and off-channel aquatic habitat to riverine organisms; (3) whether the maintenance of low-velocity fish-migration corridors need to be considered when designing river training structures to reduce potential impact on spawning fish; (4) the impact of dredging and disposal on the aquatic habitat of the main channel; (5) studies on the environmental impact from tow-boat traffic on the main channel and the mortality of fish from propellers; and (6) the fact that, subsequent to the preparation of the 1976 EIS, two species were placed on the federally endangered species list.   Endangered species under NEPA are considered significant resources and an impact analysis of the project must be conducted for each alternative.  (*Id.*)

8.     After the PDT completed its review and report, it asked the Corps'
Planning Center of Expertise for Inland Navigation (PCXIN) to review the report,
as well as the 1976 EIS and the supporting reference material.  To avoid undue
influence on the review, the report reviewed by the PCXIN did not include the
PDT's recommendation on how to proceed (AR MVS 713).

9.     The PCXIN assembled a team of subject matter experts, who
reviewed the documents and recommended a path forward.  Like the PDT, the
PCXIN determined that there had been "no substantial changes" to the Middle
Mississippi River Regulating Works Project: "[e]quipment used to conduct dike
and revetment construction/repairs is essentially the same, maintenance dredging
methods are for the most part identical, and in fact the action has evolved in time
to routine dike and revetment maintenance and less maintenance dredging" (AR
MVS 713, 719).    Nevertheless, the PCXIN also noted there was "persuasive
evidence of a substantial body of new information … relevant to environmental
concerns" (AR MVS 719) and accordingly, on December 20, 2013, the Corps
issued a Notice of Intent ("NOI") to prepare an SEIS for the St. Louis District
MMR Regulating Works Project (AR MVS 1021-22; 78 Fed. Reg. 77, 108 (Dec. 20,
2013)).  The Corps expects to have a final SEIS completed by the end of 2016
(Feldmann Decl. ¶ 6).

10.     In light of the Corps' mission to maintain the navigation channel and
the time it will take to issue a final SEIS, the Corps prepared site-specific EAs for
proposed work, including construction of new river training structures, in three

areas: Eliza Point/Greenfield Bend ("Eliza Point"), Dogtooth Bend, and Mosenthein/Ivory ("Mosenthein") (the proposed work at the Mosenthein site is primarily new revetment work with only one new river training structure) (*Id.* at ¶¶ 7–10).

11.    The EAs "tiered" off the 1976 EIS[3] but considered significant new circumstances and information relevant to the environmental impacts of each alternative on the human environment, including the research on the effects of river training structures on flood levels and the cumulative impacts of the proposed action (AR MVS 2273-2301; 2320-2346 (Mosenthein); MVS 3075-3103; 3118-3143 (Eliza Point); and MVS 3895-3923; 3940-3965 (Dogtooth Bend)).

12.    The Corps received and responded to comments on its publicly-issued draft EAs, including comments by Plaintiffs and their expert, Dr. Nicholas Pinter (AR MVS 2356-2465 (Mosenthein); MVS 3153-3198 (Eliza Point); MVS 3975-4062 (Dogtooth Bend)), and held a public hearing on the Dogtooth Bend EA (AR MVS 3975-4062).

13.    Ultimately, the Corps determined that the new construction in the three proposed work areas was not likely to adversely affect the human environment and on April 17, 2014, it issued Findings of No Significant Impact ("FONSIs") for all three work areas (AR MVS 2271 (Mosenthein); MVS 3073 (Eliza Point); MVS 3893 (Dogtooth Bend)).

---

[3] "[T]hrough a process called 'tiering,' agencies can 'relate broad and narrow actions and . . . avoid duplication and delay.'"   *Churchill County v. Norton*, 276 F.3d 1060, 1074 (9th Cir. 2001). Tiering allows an agency to eliminate repetitive discussions of the same issues.  *Id.*

14.     Plaintiffs filed their Complaint for Declaratory and Injunctive Relief on May 22, 2014 (Doc. 2).  Defendants filed their Answer on August 11, 2014, challenging as affirmative defenses both the Court's subject matter jurisdiction and the Plaintiffs' standing to bring the lawsuit (Doc. 25).

**B.     Standing**

15.     Plaintiffs are nonprofit organizations formed and operated to protect wildlife.  They have established conservation programs to restore rivers' natural functions and they take active roles in monitoring legislation and the actions of federal and state agencies that affect watershed management (Doc. 2 at 10-16; Doc. 49 at 8:3-18, 9:4-18, 11:1-19).

16.     During the October 16, 2014 hearing, Plaintiffs presented two witnesses on the issue of standing: Dr. Clark Bullard and Jamie Nash-Mayberry.  Plaintiffs have not presented any other testimony or affidavits to establish their constitutional standing.

17.     Dr. Bullard is a retired professor of mechanical engineering at the University of Illinois in Champaign-Urbana.  His specialty is in fluid mechanics and "large system optimization simulation" (Doc. 49 at 5).  He serves on the Board of Directors for Plaintiff National Wildlife Federation ("NWF") and is NWF's representative in Illinois, Ohio, and Indiana.  He was also the organization's Central Vice Chair for the intermountain states and has been a member of NWF off and on since 1970.  Dr. Bullard is also a member of Plaintiff Prairie Rivers Network's ("PRN") Board of Directors (*Id.* at 10).

18.     Dr. Bullard is fascinated by rivers, and as a canoeist and kayaker, he regularly enjoys and observes them.  He has visited various unspecified portions of the Mississippi River, but he had not seen any of the sites at issue in this motion until October 15, 2014 – the day before the hearing.  Dr. Bullard has not canoed at the Eliza Point, Dogtooth Bend, or Mosenthein/Ivory sites, but he plans to do so in the future.

19.     Dr. Bullard has not conducted a formal analysis of the Mississippi River, but he is concerned that construction of river training structures and continuing implementation of the nine-foot channel project will increase flooding. He is also concerned that canoeists on the Mississippi River could become ensnared by notched, dike-type river training structures.  He bases these concerns on his 40 years of observing rivers in the Upper Mississippi River area.

20.     Ms. Nash-Mayberry is a member of Plaintiff PRN and a high school social studies teacher (Doc. 49 at 22).  The school district where she teaches lies entirely in a flood plain between Grand Tower and Thebes.  She has worked with her students for years to raise awareness about flooding-related issues.  She is concerned about the effects of the proposed river training structures, particularly at Dogtooth Bend and Grand Tower, which are both in close proximity to where she lives and works.  She is particularly concerned about the possibility that the proposed construction in those areas could lead to higher flood levels in her community.

### III.   CONCLUSIONS OF LAW

**A.   Standing**

> **1.   *Plaintiffs National Wildlife Federation, Missouri Coalition for the Environment, River Alliance of Wisconsin, Great Rivers Habitat Alliance, and Minnesota Conservation Federation do not have standing.***

1.      Plaintiffs National Wildlife Federation ("NWF"), Missouri Coalition for the Environment ("MCE"), River Alliance of Wisconsin ("RAW"), Great Rivers Habitat Alliance ("GRHA"), and Minnesota Conservation Federation ("MCF") have failed to meet the requirements to show that they have constitutional standing to bring this lawsuit and seek preliminary injunctive relief.

2.      Under Article III of the Constitution, federal courts are limited to hearing "Cases" and "Controversies."  U.S. Const. Art. III.  This provision limits the judicial power "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).  This restriction on the power of the courts "is founded in concern about the proper – and properly limited – role of the courts in a democratic society.'"  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Permitting a court to decide a case where the plaintiff does not have standing would "allow[] courts to oversee legislative and executive action" and thus "significantly alter the allocation of power . . . away from a democratic form of government."  *Id.* at 493 (quotation omitted).

3.     Standing requires that a federal court satisfy itself that the plaintiff has "alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers*, 555 U.S. at 493 (internal marks omitted).

4.     An organization has standing when: (1) at least one of its members has or would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit. *Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 924 (7th Cir. 2008). The Corps has not contested that Plaintiffs satisfy prongs (2) and (3). The standing inquiry therefore turns on prong (1): whether Plaintiffs have presented an individual member with standing.

5.     In order for an individual to establish that he has standing, he must show that (1) he is under threat of suffering "injury in fact" that is concrete and particularized; (2) the threat is actual and imminent, not conjectural or hypothetical; (3) the threat is fairly traceable to the challenged action of the defendant; and (4) it is likely, not just speculative, that a favorable judicial decision will redress the injury. *Sierra Club*, 546 F.3d at 925. Because these elements "are not merely pleading requirements but rather an indispensable part of the … case, each element must be supported … with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 55, 561 (1992)).

6.     When the plaintiff is an environmental organization, it adequately alleges injury in fact when it avers that its members use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.  *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 183 (2000) *Sierra Club v. Morton*, 405 U.S. 727, 734-36 (1972).  Standing is not established by "averments which state only that one of [plaintiff]'s members uses unspecified portions of an immense tract of territory, on some portions of which [an] activity has occurred or probably will occur by virtue of the governmental action."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

7.     In order to establish that a member has standing, an organization is required to "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected" by the alleged wrongful activity.  *Summers*, 555 U.S. at 498 (quoting *Defenders of Wildlife*, 504 U.S. at 563).  The Supreme Court has held that without individual affidavits, a court cannot assure itself that an organization's members use the area affected by the challenged activity or will be burdened by the challenged activity.  *Id.* at 499 (quotations omitted).  An organization is required to identify members who have suffered the requisite harm.  *Id.*

8.     Plaintiffs MCE, RAW, GRHA, and MCF have not presented any live testimony or supporting affidavits to establish their constitutional standing, and the Court accordingly finds that they have no standing in this case.

9.      The Court finds that the testimony of Dr. Bullard is insufficient to establish standing for Plaintiff NWF.  Dr. Bullard had not visited any of the challenged sites before the Complaint was filed, only visiting the three sites the day before the hearing.  This is not enough.  A plaintiff must establish standing at the time the lawsuit is filed; he cannot establish it after the fact.  *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 743 n.2 (7th Cir. 2009) (plaintiff couldn't establish standing by visiting the challenged site after commencement of lawsuit); (citing *Laidlaw*, 528 U.S. at 180 (stating that court considers whether a plaintiff has standing "at the outset of the litigation")); *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) (stating that "[t]he requirements of standing must be satisfied from the outset").

10.      Moreover, Dr. Bullard's testimony failed to establish that he is under threat of imminent and irreparable injury as a result of the proposed construction at any particular site.  *See Summers*, 555 U.S. at 495 (court found that affidavit did not establish constitutional standing for organization because member's testimony was too generalized and did not identify imminent injury at a particular site).  The mere fact that he has visited unspecified portions of the Mississippi River as a canoeist and kayaker does not establish standing for NWF.  *Cf. Lujan*, 497 U.S. at 889 (finding that standing could not be demonstrated merely by offering "averments which state only that one of [the organization]'s members uses unspecified portions of an immense tract of territory, on some portions of which [some] activity has occurred or probably will occur by virtue of the governmental

13

action"); *Pollack*, 577 F.3d at 742-43 (holding that an affiant's generalized statements that he visited the Illinois shoreline of Lake Michigan and watched birds in the Great Lakes watershed were too generalized to challenge activities in North Chicago).

11.     Finally, much of Dr. Bullard's testimony relates to a past injury.  He testified that he was concerned about the general harm from the Regulating Works Project, as well as river training structures that are already in place.   This testimony relates to a past injury and is therefore insufficient to establish standing. *See Summers*, 555 U.S. at 495.

12.     The Court therefore finds that Plaintiffs NWF, MCE, RAW, GRHA, and MCF have failed to establish that they have constitutional standing.

### 2.     *Plaintiff Prairie Rivers Network has demonstrated that it has constitutional standing.*

13.     The Court finds that Plaintiff PRN has standing, based on the testimony of its member, Ms. Nash-Mayberry.  She lives and works in a flood plain along the Middle Mississippi River near Dogtooth Bend and Grand Tower.  Should the construction of new regulating works in those locations actually lead to an increase in flood levels, she and her school would be directly impacted.  Accordingly, PRN has established that at least one of its members would be directly affected by the alleged improper government conduct at issue here. *See Laidlaw*, 528 U.S. at 183.

**B.**    **Plaintiffs' Motion for a Preliminary Injunction**

14.    A preliminary injunction is always an "extraordinary remedy." *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  Plaintiffs carry the burden and must make a compelling showing that (1) this Court is likely to rule in their favor on the ultimate merits; (2) irreparable injury is likely – not just possible – in the absence of an injunction; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20, 22.  Plaintiffs must show that they meet all four of these prongs. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (even in a NEPA case, "[a]n injunction should issue only if the traditional four-factor test is satisfied"); *Winter*, 555 U.S. at 21–22 (even a strong showing of likely success cannot compensate for failure to show likely injury).

15.    No factor alone is enough to support equitable relief. *Hoosier Energy Rural Elec. Co-op. v. John Hancock Life Ins.*, 582 F.3d 721, 725 (7th Cir. 2009). Even in environmental cases such as this one, "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above." *Monsanto*, 561 U.S. at 158.  There must also be a likelihood of success on the merits, and the injunction must do more good than harm. *Id.*

**1.**    ***Plaintiffs are Not Likely to Succeed on the Merits.***

16.    Plaintiffs allege that Defendants have violated NEPA, 42 U.S.C. §§ 4321, *et seq.*, a statute that requires federal agencies to consider the

15

environmental impact of any major federal actions they undertake, and to prepare EISs for all "major Federal actions significantly affecting the quality of the human environment."   42 U.S.C. § 4332(2)(C); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 673 F.3d 518, 525 (7th Cir. 2012).

17.   Under NEPA, an agency must prepare a supplement to an EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns."   40 C.F.R. § 1502.9(c)(1)(i).   This section is interpreted to require an SEIS "if the changed plans or circumstances will affect the quality of the human environment in a significant manner… not already considered by the federal agency." *Arkansas Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005) (ellipses in original) (quoting *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 204 (1st Cir. 1999)).   "A change is substantial if it presents a 'seriously different picture of the environmental impact.'" *Id.* (quoting *S. Trenton Residents Against 29 v. Fed. Hwy. Admin.*, 176 F.3d 658, 663 (3d Cir. 1999).   "[D]etermining whether an impact is substantial is 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" *Id.* (quoting *Marsh*, 490 U.S. at 376).

18.   An agency must also prepare an SEIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Wisconsin v. Weinberger*, 745 F.2d 412, 417 (7th Cir. 1984) (quoting 40 C.F.R. § 1502.9(c)(1)(ii)).   The determination of whether an SEIS is required is a matter left to the discretion of

the agency.  *Id.; see also Marsh*, 490 U.S. at 376 (determination of whether SEIS is required turns on questions of significance, and courts defer to informed discretion of agency); *Nevada v. D.O.E.*, 457 F.3d 78, 92 (D.C. Cir. 2006) ("The decision whether to prepare a programmatic EIS is committed to the agency's discretion.").

19.    NEPA does not specifically provide for judicial review, and so this case falls under the standard of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  *See Ind. Forest Alliance v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003).  The APA allows courts to set aside agency actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  This standard of review "is a narrow one," and courts should defer to the considered judgment of an agency.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quotation omitted).  The Court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (citation omitted).

20.    Plaintiffs' Complaint challenges two decisions made by Defendants: (a) the decision to prepare an SEIS for only the MMR, and not the entire Upper Mississippi River System (Doc. 2); and (b) the decision to approve new construction under the Regulating Works Project while the SEIS is being prepared.  Accordingly, to succeed on the merits of this case, Plaintiffs must demonstrate that these decisions were arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.   The Court finds that the Plaintiffs are unlikely to meet this burden.

> **a.**   ***The decision to prepare an SEIS for only the MMR.***

21.   The Corps is currently preparing an SEIS for the Regulating Works Project in the Middle Mississippi River, based on substantial new information relevant to environmental concerns developed since the 1976 EIS.   Plaintiffs are seeking an order requiring the Corps to prepare an SEIS for the entire Upper Mississippi River system (Doc. 14-1 at 6–13), but they are unlikely to succeed because no final agency action has yet been taken on the SEIS.

22.   Under the APA, the Court can review only "final agency action."   *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).   This is important, because the agency must have the opportunity to apply its expertise in the first instance. *Norton v. S.U.W.A.*, 542 U.S. 55, 66-67 (2004); *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003); *Cronin*, 919 F.2d at 444.   "The core question is whether the agency has completed its process, and whether the result of that process is one that will directly affect the parties."   *Franklin v. Mass.*, 505 U.S. 788, 797 (1992); *Home Builders Ass'n v. USACE*, 335 F.3d 607, 614 (7th Cir. 2003).   The Corps has not completed its process; thus, this Court lacks jurisdiction to entertain any allegations that the SEIS will be deficient.

23.   Similarly, because no final agency action has been taken on the SEIS, any challenges to its scope or analysis are not yet ripe.   *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).   The ripeness doctrine prevents courts

18

"from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs*, 387 U.S. 136 at 148-49.

24. Plaintiffs are also not likely to succeed on this argument because there is no proposed action on the Upper Mississippi River system. *See Kleppe v. Sierra Club*, 427 U.S. 390, 399 (1976) (no regional EIS required when action proposed was not regional, but rather local or national in scope). The Corps' management of the Upper Mississippi River consists of many individual actions taken and yet to be taken by different Corps districts pursuant to five separate EISs and different congressional authority. In this way, Plaintiffs' challenge is not so much an attack on a specific agency action but rather a broad, programmatic challenge. Such an action cannot be maintained. *See Nat'l Wildlife Fed'n*, 497 at 891 (holding that a plaintiff "cannot seek wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made").

25. Even if this Court had jurisdiction to consider the merits of this claim, it would be unlikely to interfere with the Corps' decision. The Corps has significant discretion over the geographic scope of its analysis. *Kleppe*, 427 U.S. at 399, *Old Town Neighborhood Ass'n, Inc. v. Kauffman*, 333 F.3d 732, 735 (7th Cir. 2003) ("And when the federal agency does make a proposal, decisions about its scope must be reviewed deferentially."). Plaintiffs have not shown that the

Corps acted unreasonably in restricting its SEIS to the Middle Mississippi River segment, particularly given that both the 1976 EIS and the congressional authorization for the Regulating Works Project are directed exclusively at the MMR. *See generally* AR MVS 1-602; 36 Stat. at 659.

26.    Finally, Plaintiffs are unlikely to succeed on a claim for failure to act, pursuant to 5 U.S.C. § 706(1), because they have not alleged that the Corps "failed to take a discrete agency action that it is required to take." *SUWA*, 542 U.S. at 64. The decision whether to prepare an SEIS is one uniquely committed to agency discretion.  Accordingly, it cannot give rise to a failure to act claim.  *See SUWA*, 542 U.S. at 66 (when a statute gives the agency discretion, it is not a mandate with sufficient clarity to support a § 706(1) action).

### b.    The decision to approve new projects on the MMR while work on the SEIS is still in progress.

27.    Plaintiffs are also unlikely to succeed in showing that Defendants violated NEPA by deciding to move forward with the proposed new projects at Mosenthein, Eliza Point, and Dogtooth Bend.[4]  Federal regulations state that while an agency is preparing an EIS, it shall not take actions that would have an adverse environmental impact or limit the choice of reasonable alternatives.  *See* 40 C.F.R. § 1506.1(a).  But that does not mean that it cannot take any action at all.

28.    The same regulation explains:

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall

---

[4] The Court concludes that the Grand Tower Project is not a final agency action, as the Corps has not issued a final decision on this proposed project.

20

not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

1. Is justified independently of the program;

2. Is itself accompanied by an adequate environmental impact statement; and

3. Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives. 40 C.F.R. § 1506.1(c).

29.    Thus, courts have noted that "[e]ven if a particular agency proposal requires an EIS, applicable regulations allow the agency to take at least some action in furtherance of that proposal while the EIS is being prepared." *Monsanto*, 561 U.S. at 145; *see also ONRC Action v. BLM*, 150 F.3d 1132 (9th Cir. 1998) (when considering amendment of existing resource management plan, agency could continue to take action); *Native Village of Point Hope v. Minerals Mgt. Serv.*, 564 F. Supp. 2d 1077, 1085-86 (D. Alaska 2008); *Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 921 (D. Minn. 2005) (agency could proceed with action because old forest plan remained in effect until effective date of revision and agency action would not have adverse environmental impact).

30.    The proposed new projects at issue fall outside the prohibition set forth in 40 C.F.R. § 1506.1(c). First, they are not properly onsidered "major" federal actions. The Corps examined whether the Regulating Works Project had changed based on the use of different river training structure configurations and concluded it had not. Although the Corps determined that the Regulating Works

21

Project is a major federal action, the use of different types of dikes is but a small component of the Project.  Thus, the technical changes to the Project through the use of different regulating works do not constitute a "substantial change" sufficient to require an SEIS.  *Id.*; *see Arkansas Wildlife Fed'n*, 431 F.3d at 1103 (noting that "the change in the Project is one of design" and did not warrant a SEIS).

31.    This Court must defer to the Corps' reasonable conclusions that the Regulating Works Project has not changed because of technical changes to the structures used to implement the Project.  *See Marsh*, 490 U.S. at 376; *Arkansas Wildlife Fed'n*, 431 F.3d at 1103.   The question of whether a change is so substantial as to require supplementation "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376.  Particularly given that "the NEPA process involves an almost endless series of judgment calls," Plaintiffs are not likely to demonstrate that the Corps acted in an arbitrary or capricious manner.  *See Arkansas Wildlife Fed'n*, 431 F.3d at 1104 (quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C.Cir.1987)).

32.    Second, the projects are covered by an existing program statement. Although Plaintiffs' believe it to be "obsolete," the 1976 EIS is still valid and in effect, even while it is being updated.  *See Sierra Club*, 352 F. Supp. 2d at 921 (agency could proceed with action because old forest plan remained in effect until effective date of revision and agency action would not have adverse environmental impact).

33.     Third, the Corps has determined that the proposed new construction is not likely to "significantly affect the quality of the human environment."   40 C.F.R. § 1506.1(c).  An agency may comply with NEPA's purpose by preparing a shorter EA and issuing a finding of no significant impact (FONSI), "which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757-58 (2004); *Monsanto*, 561 U.S. at 145; *Highway J*, 349 F.3d at 960. That is precisely what the Corps did in this case.

34.     The three site-specific EAs and FONSIs are final agency actions that may be challenged under the APA and are ripe for review.  *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006); *SW Williamson Cnty. Cmty. Ass'n v. Slater*, 173 F.3d 1033, 1036 (6th Cir. 1999).  The Court examines them under the APA's arbitrary and capricious standard.  *See Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 862 (7th Cir. 2003).

35.     The EAs for each proposed new construction activity on the MMR address new information and studies that have been done since the 1976 EIS was completed, including the effects of river training structures on flood levels. Appendix A in each EA summarizes the research on the effects of river training structures on flood levels.   The Corps has analyzed this information and explained its conclusion that, based on the research and the Corps' own expertise and state-of-the-art tools, the proposed river training structures will not increase

flood heights (AR MVS 2273-2301 (Mosenthein); MVS 3075-3103 (Eliza Point); MVS 3895-3923 (Dogtooth Bend)).

36.   Plaintiffs disagree with the Corps' conclusions, but it is not the province of this Court to resolve that disagreement or to choose a side.  Where, as here, the Corps has considered the issue and explained its conclusions, it has not acted arbitrarily, and that is as far as the Court's inquiry can proceed.  *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010) (noting that "experts in every scientific field routinely disagree" but "such a 'battle of the experts'" does not establish a NEPA violation); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009) (holding that the court cannot "simply substitute the judgment of plaintiff's experts for that of the agency's experts" because the court must defer to agency choices and methodology); *cf. Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

37.   Plaintiffs argue that the Corps has failed to analyze the specific river training structures, including bendway weirs and chevrons, but this argument does not hold up.  In the EAs, the Corps examined the specific structures being proposed.  *See, e.g.*, AR MVS 3859-60, 3869, 3877–78, 3889-90.  In addition, the 1976 EIS discussed that river training structures could have various designs.  And the Corps' examination of the 1976 EIS (by both the PDT and PCXIN)

determined that the technical changes in structures were not a substantial change from the 1976 EIS.

38.     By issuing a FONSI for each of the proposed projects, the Corps determined that the projects would not have a significant impact on the environment.  Thus, the Corps complied with the regulations, and Plaintiffs are unlikely to demonstrate that the Corps acted arbitrarily, capriciously, or contrary to law by deciding to move forward while the SEIS remains unfinished.  *See* 40 C.F.R. § 1506.1(a); *see also N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842–44 & n.30 (9th Cir. 2007) (rejecting argument that 1506.1(c) requires injunction limiting all coal bed methane development activity during pendency of EIS); *Native Village of Point Hope*, 564 F. Supp. 2d at 1084 (finding it consistent to issue EAs for several projects in question, "notwithstanding the determination to conduct an EIS"); *Intertribal Bison Co-op v. Babbitt*, 25 F. Supp. 2d 1135, 1139 (D. Mont. 1998) (when agency issued FONSI for an interim plan while a long-range plan was being prepared, the interim plan was not major federal action significantly affecting the quality of the human environment and 40 C.F.R. § 1506.1 did not apply); *Fund for Animals v. Lujan*, 794 F. Supp. 1015, 1024–25 (D. Mont. 1991) (action may proceed without EIS if not anticipated to have adverse environmental impact or limit the choice of reasonable alternatives), *aff'd*, 962 F.2d 1391 (9th Cir. 1992).

39.     Nor did the Corps violate NEPA by tiering its EAs to the 1976 EIS. Federal regulations encourage tiering in order to streamline and focus the review

process on the actual issues being decided. 40 C.F.R. §§ 1502.20, 1508.28. Tiering also shows that the individual actions were taken as part of the larger Project to obtain and maintain the navigation channel.

40.    Tiering was appropriate here for three reasons.  First, the EAs are only minimally tiered to the original EIS.  For example, they note that some of the alternatives that were considered but determined to be unreasonable, such as ceasing all activity or building locks and dams, were also considered and rejected in the 1976 EIS (AR MVS 2241 (Mosenthein); MVS 3042 (Eliza Point); MVS 3859 (Dogtooth Bend)).

41.    Second, the EIS still contains valid information about the Project to maintain the navigation channel in the MMR, including a history of the Project, a discussion of the Project's purpose, and a detailed description of the Project's authorization, all of which were appropriate for incorporation into the EAs.

42.    Third, tiering was appropriate because the Corps fully considered the new information and circumstances in the EAs.  The EAs list the significant new circumstances and information on the potential impacts of the Regulating Works Project relevant to the EAs, and explain where the discussion of that new information can be found in the EA (AR MVS 2235-36 (Mosenthein); MVS 3037-38 (Eliza Point); MVS 3853-54 (Dogtooth Bend)).  The EAs also have two twenty-page appendices dedicated to reviewing the scientific studies done since the 1976 EIS (*see*  AR MVS 2273-2301; 2320-2346 (Mosenthein); MVS 3075-3103; 3118-3143 (Eliza Point); MVS 3895-3923; 3940-3965 (Dogtooth Bend)).  The Corps

specifically responded to Plaintiffs' and Dr. Pinter's comments (AR MVS 2356-2465 (Mosenthein); MVS 3153-3198 (Eliza Point); MVS 3975-4062 (Dogtooth Bend)).

43.     Plaintiffs do not point to any information that the EAs allegedly failed to address; rather, they argue simply that the information should be addressed in an EIS.  This Court will not elevate form over substance.  *Cf. Highway J*, 349 F.3d at 958-59.  The Corps met NEPA's purposes of informed decision-making and public involvement by publishing draft EAs, soliciting and responding to public comment, holding a public hearing for the Dogtooth site, and analyzing all new information in an EA.  *See id.*; *see also Balt. Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

44.     Plaintiffs' are unlikely to establish that the Corps' decision to tier the EAs to the 1976 EIS violated NEPA.  *See Defs. of Wildlife v. B.O.E.M.*, 684 F.3d 1242 (11th Cir. 2012) (upholding EA tiered to EIS & SEIS that needed updating); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 512 (D.C. Cir. 2010) (noting that "courts have required [EAs] to analyze certain impacts for the first time when the broader analysis did not address the impact in question at all" and that "NEPA does not limit tiering to analyses still on the scientific cutting edge"); *Ark. Wildlife Fed'n v. USACE*, 431 F.3d 1096, 1101-02 (8th Cir. 2005) (upholding a tiered EA that "provided an updated and adequate analysis of any new environmental impacts"); *La. Crawfish Producers Ass'n-West v. Rowan*, 463

F.3d 352, 358 (5th Cir. 2006) (holding that an EA can tier to an "out-of-date EIS").

### 2.    *Plaintiffs Have Not Demonstrated Imminent Irreparable Harm.*

45.    Plaintiffs have not demonstrated that imminent irreparable harm is likely to occur before the Court may rule on the merits of the case.  To constitute irreparable harm, an injury must be "certain, great, actual and not theoretical," "not harm that is merely serious or substantial."  *Heideman v. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (interior quotations and citations omitted); *see also Int'l Union, Allied Indus. Workers of Am., AFL-CIO v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir. 1982).

46.    Plaintiffs' asserted irreparable injury is speculative because they cannot show that these particular structures will have any measurable effect on flood heights.  Dr. Pinter's declaration does not address the likely impacts of the three specific EAs with sufficient specificity to show irreparable harm. Conclusory statements are insufficient to demonstrate likelihood of irreparable harm.  *Herb Street Enterprises, LLC v. Florida Entertainment Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

47.    There are hundreds of river training structures in the MMR. Plaintiffs themselves acknowledge that the Corps added hundreds of new structures in the past three decades, and 150 bendway weirs between 1990 and 2000 alone.  Here, between the three projects, the Corps will add a total of twelve more bendway weirs and three dikes.  Plaintiffs have not demonstrated that this small number of additional river training structures will likely cause irreparable

harm.  Plaintiffs' demonstration of irreparable harm is too speculative to justify the extraordinary relief of a preliminary injunction.

### a.   *There is no demonstrated increase in flooding risk.*

48.   The Court finds that Plaintiffs have not demonstrated that the three new projects, the Grand Tower Project, or any other future river training structure will increase flooding risk.

49.   The Corps has continually and extensively analyzed the physical effects of river training structures and reasonably concluded that they do not impact flood levels (AR MVS 2273-2301 (Mosenthein); MVS 3075-3103 (Eliza Point); MVS 3895-3923 (Dogtooth Bend); *see also* Brauer Decl. at ¶¶ 8-24).  The record shows that the Corps has actively studied the impact of river training structures on water surfaces since the 1930s, taking into account any new information or research presented on the issues.  The Corps has worked with the US Geological Survey ("USGS") and external, independent technical experts and researchers in academia including the University of Missouri-Rolla, University of Iowa, Colorado State University, and the University of Illinois using state-of-the-art tools.  The Corps has also reviewed the most recent data available regarding the impact of river training structures on flood heights, including recent analysis based on Dr. Pinter's research originally presented in 2001 (AR MVS 2252 (Mosenthein); AR MVS 3053 (Eliza Point); AR MVS 3873 (Dogtooth Bend); Brauer Decl. ¶ 8).  As part of the EA process, the Corps solicited comments from the public, and both NWF and Dr. Pinter commented on the proposed projects (AR MVS 2356-2465 (Mosenthein); MVS 3153-3198 (Eliza Point); MVS 3975-4062

(Dogtooth Bend); Brauer Decl. ¶¶ 9-11).   The Corps carefully considered and responded to those comments (AR MVS 2273-2301, 2356-2465 (Mosenthein); MVS 3075-3103, 3153-3198 (Eliza Point); MVS 3895-3923, 3975-4062 (Dogtooth Bend); Brauer Decl. ¶¶ 9-17).

50.   The record shows that the initial research claims that river training structures increase flood levels began in the mid-1970s with Dr. Belt from St. Louis University and Drs. Stevens, Simons, and Schumm from Colorado State University (AR MVS 2282 (Mosenthein); MVS 3084 (Eliza Point); MVS 3904 (Dogtooth Bend)).   A majority of the most recent research on this issue comes from Southern Illinois University-Carbondale, including Drs. Pinter, Remo, Jemberie, and Huthoff (AR MVS 2294 (Mosenthein); MVS 3096 (Eliza Point); MVS 3916 (Dogtooth Bend)).   The Corps believes that both the early and recent research concluding that river training structures increase flood heights all contain faulty data and assumptions, leading the Corps, in conjunction with the USGS and other independent researchers, to disagree with that conclusion.   *See generally* AR MVS 2273-2301 (Mosenthein); MVS 3075-3103 (Eliza Point); MVS 3895-3923 (Dogtooth Bend); Brauer Decl.).   The Corps' conclusions in analyzing all of the available research and data over the years on the issue have not changed.

51.   The Court finds that Plaintiffs have not shown conclusively that flood levels have increased as a result of river training structures and that the

structures have a detrimental impact on public safety.  Brauer Decl. ¶ 9.  The Court finds that Plaintiffs cannot show imminent harm.

52.   The Court has reviewed the declaration of Dr. Pinter filed by Plaintiffs in support of their request for injunctive relief and has reviewed the declaration of Edward Brauer filed by the Corps in support of its opposition.  The Court finds that Dr. Pinter's statements do not show that the risk of flooding from the three potential work sites at issue is actual or imminent.

53.   In its record and declaration, the Corps points out that the source data and methodology used by Dr. Pinter contains major errors that put the conclusions into question.  *See* AR MVS 2273-2301 (Mosenthein); MVS 3075-3103 (Eliza Point); MVS 3895-3923 (Dogtooth Bend); Brauer Decl. ¶¶ 16-24.  One such example is the fact that Dr. Pinter relies on early discharge measurements (or volume of water that passes a specific location over time) data collected before the USGS implemented standard instrumentation and procedures in 1933, and this data has shown to be inaccurate by not only the Corps but the USGS and other independent researchers.  Brauer Decl. ¶ 18.  As another example, Dr. Pinter also relies upon studies conducted in a rigid, fixed bed plume, the limitations of which have been acknowledged by the authors of the studies: "The fixed bed scenario is not a reasonable description of a natural river channel with a moving sediment bottom and is expected to yield a conservative result for the backwater effect relative to that likely to be experienced in a non-erodible boundary channel."  *Id.* ¶¶ 12, 23.  The MMR is not a fixed bed.  The river bed is

ever-changing, and the purpose of river training structures is to make the river bed deeper.  A fixed bed model cannot replicate the changes that occur to the natural river as a result of the construction of river training structures.  AR MVS 2291 (Mosenthein); MVS 3093 (Eliza Point); MVS 3913 (Dogtooth Bend).  Dr. Pinter uses daily discharge data, which is based upon estimates and is not measured or observed.  This usage creates data errors because the data lacks the natural variability found in a variable channel, such as the MMR.  Brauer Decl. ¶ 19.  Dr. Pinter also discusses many different rivers and river reaches and compares data between them without acknowledging the differences between them.  *Id.* at ¶ 24(a); Pinter Decl. ¶¶ 16, 18, 19.  The MMR has a different flow and sediment load and hence different sediment management practices than other reaches of the Mississippi River, much less other rivers.  Brauer Decl. ¶ 24(a).  The Court finds that the Corps' rejection of Dr. Pinter's examples and data is not arbitrary or capricious.

54.   The Court finds that Plaintiffs have not shown that they will suffer imminent and immediate harm from any alleged environmental degradation that will occur because of the proposed projects.  The record shows that the Corps adequately examined the details on the historic and existing condition of resources in the area potentially affected by the project-related activities, noting that "[t]o the extent possible under existing authorities, environmental laws, regulations, and policies, the District considers the environmental consequences of its activities as it constructs and operates the Project and acts accordingly."  AR

MVS 2235 (Mosenthein); MVS 3037 (Eliza Point); MVS 3853 (Dogtooth Bend). The Corps undertook a full examination of the proposed projects' impacts and determined that they would minimize negative impacts to the environmental features within reach and would maintain existing physical conditions. AR MVS 2244-2251 (Mosenthein); MVS 3045-3052 (Eliza Point); MVS 3862-3872 (Dogtooth Bend). In fact, the record shows that the use of innovative river training structures, like those proposed to be built, were developed to provide habitat diversity and associated environmental benefits to aquatic organisms in the MMR. AR MVS 2252-2265 (Mosenthein); MVS 3053-3067 (Eliza Point); MVS 3873-3887 (Dogtooth Bend).

55.    The Court further finds that Plaintiffs do not demonstrate any irreparable harm that is likely to occur before the merits of the case will be decided. Plaintiffs focus on the alleged general danger from the Regulating Works Project and structures that are already in place. Plaintiffs also rely heavily on alleged harm that may occur from construction of the proposed Grand Tower project. But as the record shows, the Corps has not completed its analysis of this project nor has it issued an EA or planned for any construction. The Court finds that harm, therefore, is not imminent. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011) (stating that for preliminary relief to be granted, the irreparable harm must also be likely). The Court finds that Plaintiffs have not shown that imminent harm will occur from the Corps awarding the contracts or even from construction in the three proposed areas.

56.    The Court finds that Plaintiffs have failed to show that irreparable harm is likely to occur from a potential increase of flood height due to the proposed projects before this Court can decide the merits of the case.

### b.    *Plaintiffs' alleged procedural injury is insufficient to justify a preliminary injunction.*

57.    The Court finds that Plaintiffs have not shown an irreparable injury sufficient to support a preliminary injunction from the Corps' alleged NEPA violation.  "Merely establishing a procedural violation of NEPA does not compel the issuance of a preliminary injunction."  *Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992).  This is because an alleged NEPA violation does not create a presumption of irreparable injury.  *See Amoco Prod. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987); *see also Monsanto*, 130 S. Ct. at 2757 (holding that even in NEPA cases, plaintiffs must meet traditional four-factor test for an injunction to issue).  Instead, Plaintiffs must show actual imminent irreparable injury. *Winter*, 555 U.S. at 22.

58.    "The harm with which courts must be concerned in NEPA cases is not, strictly speaking, harms to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates."  *Jones v. D.C. Redev. Land Agency*, 499 F.2d 502, 512 (D.C. Cir. 1974).  The Court finds that the Corps conducted an informed analysis of the information available to it and provided more than adequate information to inform the public of its proposed projects.

59.     The Court finds that Plaintiffs have not shown that they will be irreparably harmed by the alleged NEPA violation.  Plaintiffs, as the complaining party, must show that they will be irreparably harmed by an alleged NEPA violation and not just the public.  *Lujan*, 497 U.S. at 882-83.  Plaintiffs allege that the Corps' actions "will irreparably harm the public by depriving them of information and analyses essential to an informed decision" (Doc. 14-1 at 17).  This is insufficient to establish irreparable harm.  *See Lujan*, 497 U.S. at 882-83.

60.     *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008), is instructive.  In that case, the Supreme Court reversed the grant of a preliminary injunction, noting that the activity being performed was not a new activity but had been ongoing for the last 40 years: "Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures."  *Id.* at 23. The Court noted that the Navy "took a 'hard look at environmental consequences' . . . as evidenced by the issuance of a detailed, 293-page EA."  *Id.*  As in *Winter*, the work that the Corps is doing is not new; it is part of its ongoing Regulating Works Project.

61.     The Seventh Circuit also addressed this issue in *Wisconsin v. Weinberger*, where the court noted that although there is a risk of predetermination by an agency when a project proceeds before the NEPA process is complete, that risk is lessened when the project is one that is ongoing. 745 F.2d at 427.  The court also noted in that particular case the commitment entailed by

the construction effort was relatively small and that the President, Congress, and the Court "have the power to bring the Navy back in line." *Id.* So too here. The work the Corps intends to do is minimal in light of the scope of the Regulating Works Project, which has been ongoing since the 1830s.

62.    The Corps has taken a hard look at the environmental consequences of construction of new river training structures, including new information and circumstances since 1976, and concluded that there is not a significant impact to the environment that has not been avoided and minimized through the design of the structures.  AR MVS 3853-54, 3887-88, 3893 (Mosenthein); AR MVS 2265-66, 2271 (Eliza Point); AR MVS 3067-68, 3073 (Dogtooth Bend); *see River Road Alliance v. U.S. Army Corps of Eng'rs*, 764 F.2d 445, 451 (7th Cir. 1985) ("The Corps also has a fund of knowledge and experience regarding the Mississippi River that judges of a federal court of appeals cannot match").  Accordingly, the Court finds that Plaintiffs have failed to meet their burden of demonstrating that irreparable injury will occur.

### 3.    *The balance of harms favors the Corps, and an injunction would be contrary to the public interest.*

63.    Even if the Plaintiffs could demonstrate irreparable harm, the Court finds that the balance of harms favors not issuing an injunction.  This Court must determine "whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Wisconsin*, 745 F.2d at 424 (reversing an injunction entered

without balancing of harms).  If the injunction is contrary to the public interest, the Court may deny an injunction even where irreparable injury exists.  *Winter*, 555 U.S. at 16; *Amoco*, 480 U.S. at 545; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

64.    Here, any harm to Plaintiffs is outweighed by the harm to the Corps and the public from preventing construction of any new river training structures in the Upper Mississippi River.  First, the Court finds that an injunction preventing the Corps from constructing river training structures until this Court issues a decision on the merits or an SEIS is completed, would significantly impede the Corps' ability to maintain the congressionally-mandated navigation channel and its associated public economic benefits.  Feldmann Decl., ¶ 17; AR MVS 2244-2265 (Mosenthein); MVS 3045-3067 (Eliza Point); MVS 3862-3887 (Dogtooth Bend).  The record shows that the MMR is a critically important navigation corridor that provides for movement of a wide variety of commodities of local, national, and international importance.  From 2003 to 2011, the MMR saw an average of 106 million tons shipped by barge.  *See, e.g.*, AR MVS 3870-71. Moreover, the record also shows that Congress has specifically adopted the Corps' plan to maintain the MMR navigation channel through regulating works, with dredging only when necessary.

65.    The record shows that if the Corps is enjoined from constructing river training structures, it will have to rely on expensive dredging to maintain the navigation channel.  AR MVS 4053 ("It is unclear whether or not dredging alone

would suffice to maintain a safe and dependable navigation channel . . . ."); Feldmann Decl. ¶ 18.   Dredging costs approximately $470,000 a year for the Dogtooth Bend area (AR MVS 3871), $185,000 a year for the Eliza Point area (AR MVS 3051, 3059), and $650,000 a year for the Mosenthein area (AR MVS 2249). *Id.* at ¶ 20.   This is a significant expense to the public fisc.   Moreover, the Corps has a number of O&M activities that it is simply unable to fund.   The money currently being spent on dredging could be allocated to other uses if the river training structures are constructed.   Feldmann Decl. ¶ 16.   The Court finds that this is significant harm to the Corps.

66.   The record shows that the public as a whole also benefits from the Regulating Works Project.   Particularly in low water years, the Regulating Works Project has had a significant impact.   For example, the Corps recorded a significant decrease in accidents within the navigation channel when comparing two low-water years, 1988 and 2012.   AR MVS 4053.   The Corps was also able to maintain the navigation channel open with 50% less dredging in 2012 than in 1988 because of the installation and maintenance of Regulating Works Projects even though water levels were lower for a longer period of time in 2012 than in 1988.   *Id.;* Feldmann Decl. ¶ 18.   The benefit to cost ratio for the Regulating Works Project construction completion is 18 to 1, which means that for every dollar the government spends on this Project, the Nation realizes estimated benefits of eighteen dollars to the national economy.   Feldmann Decl. ¶ 17.   This is one of the most valuable projects in the nation in form of returns of investment.

*Id.*  The Court finds that an injunction would prevent the Corps and the public from reaping the benefits of the Regulating Works Project and would thus impose harm on the public.

67.    The record also shows that two of the site-specific projects are being pursued in part due to safety factors.  The Eliza Point area, in particular, has high accident rates relative to other nearby reaches (5.4 per year v. less than 1 per year), because certain water levels cause high rates of collision with the U.S. Route 60/62 Bridge.  *See* AR MVS 3044, 3051, and 3059.  If the project were delayed, "the safety of the navigation channel would continue to be an issue going forward with high accident rates at the U.S. Route 60/62 Bridge."  AR MVS 3059. In the Dogtooth Bend area, as well, there were nine groundings and one collision between 2000 and 2010.  AR MVS 4053.  The Corps expects that the proposed river training structure will decrease accidents.  *Id.*  "In exercising [its] sound discretion, [the Court] should pay particular regard for public consequences in employing the extraordinary remedy of injunction."  *Weinberger*, 456 U.S. at 312; *see also Salazar v. Buono*, 130 S. Ct. 1802, 1816 (2010) ("[A] court should be particularly cautious when contemplating [injunctive] relief that implicates public interests.").  Mindful of the public consequence of Plaintiffs' requested relief, the Court finds that an injunction would put public safety at risk.

68.    The Court finds that the Corps would incur other expenses if an injunction were issued.  The record shows that the Corps awarded two contracts: one for the Dogtooth Bend/Eliza Point areas and one for the Mosenthein area.

Based on the Corps' previous experience with the eligible and capable pool of contractors to complete this work in the MMR, if the Corps' construction contracts are delayed, some contractors may decide to seek work elsewhere. Feldmen Decl. ¶ 13.  As a result, the Corps may incur difficulty in obtaining contractors with sufficient capacity and expertise to execute the navigation mission in the St. Louis District, which could increase the price to the government.  *Id.*  Longer delays may also lead to greater impacts and expense because the Corps may have to re-evaluate certain items based on the overall dynamics and complexity of managing the MMR flow and associated sediment. *Id.* ¶ 14.  The Court finds that all of these costs not only injure the Corps, but also the public.

69.   The record shows that the new projects maintain a safe and navigable channel, as congressionally-authorized, and prevent impacts to the navigation industry and the consumer.   The Court therefore finds that a preliminary injunction would delay all of those benefits and not serve the public interest.

## IV.   CONCLUSION

70.    In conclusion, the Court **DENIES** Plaintiffs' motion for a preliminary

injunction (Doc. 14).

**IT IS SO ORDERED.**

Signed this 25th day of November, 2014.

David R. Herndon
2014.11.25
10:12:35 -06'00'

**United States District Judge**

41